224 N.J. Super. 280 (1988)
540 A.2d 227
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
GABRIEL PEMBERTHY, DEFENDANT-APPELLANT.
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RIGOBERTO MONCADA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 22, 1988.
Decided April 5, 1988.
*283 Before Judges PETRELLA, DREIER and BAIME.
Louis N. Rainone argued the cause for appellant Gabriel Pemberthy (A-767-84T4) (Karcher, McDonnell & Rainone, attorneys; Louis N. Rainone, of counsel and on the brief).
Philip A. Ross, Designated Attorney, argued the cause for appellant Rigoberto Moncada (A-1994-84T4) (Alfred A. Slocum, Public Defender; Philip A. Ross of counsel and on the brief).
Richard H. Morton, Deputy Attorney General, argued the cause for respondent State of New Jersey (W. Cary Edwards, Attorney General; Jeffrey L. Menkin on the brief).
PER CURIAM.
Defendants Gabriel Pemberthy and Rigoberto Moncada[1] were convicted after a jury trial of conspiracy to distribute and possess with intent to distribute more than one ounce of cocaine (N.J.S.A. 24:21-24; 24:21-19 a(1) and 24:21-19 b(2)). Pemberthy *284 was also convicted of possession of more than one ounce of cocaine (N.J.S.A. 24:21-20 a(2)); possession of said cocaine with intent to distribute (N.J.S.A. 24:21-19 a(1) and b(2)), and theft of services (N.J.S.A. 2C:20-8 a). The cocaine involved had an estimated street value of between $12,000,000 and $13,000,000. Pemberthy and Moncada were tried jointly before a jury. They each appealed. We now consolidate those appeals for purposes of this opinion.
Defendants' motions for judgments of acquittal or in the alternative for a new trial were denied on September 7, 1984. When Pemberthy was sentenced the trial judge merged the convictions for possession and possession with intent to distribute into the conviction for conspiracy to distribute and possession with intent to distribute.[2]
Pemberthy was sentenced to life imprisonment with a 25 year period of parole ineligibility, a $20,000 fine and assessed a $25 penalty in favor of the Violent Crimes Compensation Board. He was also sentenced to a consecutive 18 month term and an additional $25 Violent Crimes Compensation Board penalty for theft of services from the telephone company by the use of a so-called "blue box."
Moncada was sentenced to 30 years in prison with a 15 year period of parole ineligibility, a $20,000 fine and a $25 penalty to the Violent Crimes Compensation Board.
Pemberthy raises the following points in his brief on this appeal:
1) The State's failure to properly minimize and eliminate conversations mandates suppression of all conversations intercepted during the wiretap.
2) The affidavit submitted in support of the State's application for an order permitting the interception of wire communications over telephone facility (201) 353-4264 was insufficient to support the issuance of said order.

*285 A) The application of Detective Miterotonda failed to show that normal investigative procedures would be unsuccessful. Hence, the order following therefrom was invalid.
B) The State failed to show the necessary probable cause to warrant the order to intercept communications over the Pemberthy facility, and, accordingly, the evidence derived from the wiretap should be suppressed:
i) The phone company wiretaps.
ii) The translator's expertise.
iii) Speculation of the affiant.
C) The affiant did not show "special need" as required by N.J.S.A. 2A:156A-11.
3) The defendant was denied a fair trial based upon the systematic exclusion of Hispanic jurors by the use of the State's peremptory challenges.
4) The court below erred in imposing sentence as same was unduly punitive and the court failed to consider aggravating and mitigating factors.
Moncada raises the following points in his brief on this appeal:
1) A new trial is mandated due to the State's obvious plan to systematically exclude all Spanish-speaking individuals from the jury panel.
2) All evidence seized from the electronic surveillance of the Pemberthy telephone should have been suppressed.
3) The State failed to comply with the prerequisites of N.J.S.A. 2A:156A-12 and State v. Catania, in not properly minimizing the wiretapped conversations.
4) The court improperly qualified two State's witnesses as experts and allowed them to testify in areas far beyond the scope of their knowledge.
5) It was improper for the trial judge to show his complete belief in the State's case and chief expert witness in the presence of the jury.
6) The defendant was deprived of a fair trial by the court's admission of much prejudicial testimony and exhibits before the jury.
7) The court's charge and supplementary charges to the jury were clearly improper.
8) The trial court should have charged the lesser included substantive offense on the conspiracy count.
9) The court should have directed a new trial to the defendant at the end of the entire case as the verdict was clearly against the weight of the evidence and was the result of unwarranted compromise and confusion.
10) The sentence imposed on defendant was clearly unreasonable and shocks the judicial conscience. In addition, the sentence was illegal due to the court's failure to address aggravating and mitigating factors.
In addition to the points raised in his brief, Pemberthy incorporates the arguments not specifically raised in his brief by adopting the arguments raised by Moncada in Points 4, 5, 6 and 7.
*286 The proceedings involved in this matter were protracted. In addition to the bail hearing conducted on November 18, 1983, five days of hearings on a suppression motion were conducted between December 1983 through March 29, 1984; minimization hearings were conducted on 14 days from April 9 to May 31, 1984; and eight additional days on minimization and Driver[3] hearings were held between June 4 through June 14, 1984. The jury selection took place from June 14 through June 18, 1984 and the 20-day trial began on June 19.
The investigation giving rise to the eventual arrest and conviction of defendants essentially began when a telephone company investigator contacted the Elizabeth Police Department on April 4, 1983 concerning the use of a "blue box"[4] at the Pemberthy residence. In the course of investigation by the telephone company of the "blue box" they intercepted and recorded telephone conversations and ultimately brought these conversations to the attention of the Elizabeth Police Department. A court order was obtained and recordings of these conversations were furnished to the Police Department. The conversations were predominantly in Spanish and had to be translated into English by the investigators. These conversations formed part of the basis for the application for a wiretap on the Pemberthy residence telephone. According to the testimony adduced at the trial, the defendants used various aliases from time to time. They also used certain code phrases in their conversations. The State produced expert testimony explaining the significance of the conversations. Surveillances were also conducted and as a result of the wiretaps and the surveillances the investigators obtained considerable information concerning drug dealing. The discussions in various telephone calls were *287 between Pemberthy and Moncada and an unidentified person in Colombia and concerned packages that had been sent from Colombia, the price, and the payment of points. Suffice it to say that the evidence presented to the jury was sufficient to establish beyond a reasonable doubt substantial trading in narcotics which involved both Pemberthy and Moncada.
The calls that were monitored to Colombia were all made using the "blue box." The calls were all couched in language which attempted to be vague and obtuse and talked about "intensity" of the product, dosages, points and people who kept being disloyal. There was testimony by the State's expert that each point referred to $10,000 and that $40,000 was the then current price in the Union County area for a "kilo of cocaine."
As part of the surveillance Moncada was observed on May 25, 1983 at Newark Airport in the arrival area of Eastern Airlines carrying a "dark blue Eastern Airlines flight bag." Pemberthy picked him up, and they went to a White Castle restaurant before going home. When Moncada was arrested the police discovered a boarding pass in the name of "Reyes" dated May 23, 1983 for a flight from New York City to Miami, Florida. They also found a return boarding pass for a flight from Miami to Newark dated May 25, 1983 in the same name.
On May 26, 1983 Pemberthy made a "blue box" call to a woman, Ana Milena, who said she was in Baltimore and that "everything [was] smooth." Pemberthy told her to "come down like a sausage." The State's expert opined that this was a colloquial phrase meaning she should "slip in as fast as [she could]." Pemberthy was observed by a surveillance team on that date driving to the White Castle, using the pay telephone, and then meeting Moncada as he arrived in a white Datsun station wagon. They were followed to several other locations and finally around noon they arrived back at Pemberthy's apartment where they found Milena in a black Monte Carlo. The three individuals then proceeded in the station wagon to a store on Broad Street in Elizabeth where Milena was dropped *288 off while the others drove around the block. Milena came out of the store with Kim Lotterman and they all went to the International House of Pancakes. All four individuals were arrested when they left the restaurant.
Search warrants were executed for Pemberthy's apartment, Moncada's apartment and the various vehicles used by them. When Pemberthy's apartment was searched the "blue box" was discovered as well as a white bag containing $74,000 in cash. In addition, a black attache case was found containing papers belonging to Pemberthy, jewelry and approximately $11,900. The papers included registration for a 1981 Datsun and a 1971 Volkswagen as well as a passport from Colombia with the name Gabriel Pemberthy Velasquez and a receipt for a mobile phone radio in the name of Pedro Pena.
The search of Moncada's apartment disclosed an Eastern Airlines boarding pass in the name of "Reyes" with the designation of Miami, Florida from John F. Kennedy Airport in New York dated May 23, 1983. A Venezuelan passport was found with Moncada's picture and the name "Campos Esteves Reyes Omar." The police found a boarding pass dated May 25, 1983 from Florida to Newark in his bedroom and a certificate of ownership in Moncada's name for a 1981 Datsun and $18,303 in small denominations wrapped in white tape and elastic bands. No narcotics were found in Moncada's apartment.
The Monte Carlo driven by Milena was searched and four packages of cocaine were found in a compartment underneath stereo speakers in the back window deck of the car. A total of 17.9 pounds (in excess of 8 kilograms) of cocaine were taken from the vehicle and tests on two of the bags revealed that the cocaine was approximately 80% pure.
A search of Moncada's vehicle disclosed no drugs, but in a brown leather attache case the police found letters addressed to Moncada, a deposit slip in Pemberthy's name, and a beeper or device for a mobile phone radio system, among other things.
*289 An investigator who was qualified as an expert in the investigation of narcotics matters, including packaging and methods of distribution testified on behalf of the State that the drug dealer will often use a beeper "to shield his identity." This witness thought it was significant that the drugs were packaged in kilos because cocaine is commonly purchased and sold in that amount. He also opined that the drugs were possessed solely with intent to distribute because of the amount in question, and the fact that it was pure, uncut cocaine indicated that it came directly from the source. The witness testified that most of the cocaine in Union County came from South America.
This witness also testified that in his opinion on May 26, 1983, 17.9 pounds of 80% pure cocaine had a potential street value of $12,000,000 to $13,000,000. However, in the manner in which it was packaged, the street value was between $35,000 and $40,000 a pound so that the total value of 17.9 pounds would be just over $600,000. A kilo 80% pure would sell for between $65,000 and $80,000 in Union County. He contrasted this with the value in Florida of between $20,000 and $35,000 per pound. At the source, in Colombia, the value would be approximately $10,000 per pound. This witness had testified for the Grand Jury that in Colombia the value was $10,000 a kilo. At trial, the witness testified that he meant to say pound.
Pemberthy testified on his own behalf and indicated that he had a common-law marriage in Colombia, but that when he came to the United States Ana Nomelin Milena approached him and offered to help him obtain his permanent resident status. For this assistance he paid her $2,000. He explained that he had obtained a position at Golden Lines Company, a distributor of pots and pans and that the company gave him a "beeper" to use. He said that he and Moncada were also trying to establish a "book dealership" for Spanish books. This was obviously with reference to the use of the word book (which the State's expert testified meant kilo) and related terms in some of the telephone conversations that had been monitored. Pemberthy ultimately obtained his residency in this country by marrying *290 Milena. The defense also presented testimony attempting to explain other references in the monitored telephone conversations. The jury obviously disbelieved that testimony and the explanations offered with respect to the contents of the telephone calls.

I
Pemberthy and Moncada both argue that the State improperly used peremptory challenges in excusing all Spanish and Spanish-speaking jurors from the panel. They thus argue that State v. Gilmore, 103 N.J. 508 (1986), applies and necessitates a reversal. The State responds by arguing that not only did both defendants fail to make a timely objection, but that exclusion of the potential jurors was not based on group affiliation.
Our review of the record satisfies us that the interpretation and translation of many of the telephone conversations constituted a major issue at the trial, and that many disputes centered on the the interpretation of the statements made in the intercepted telephone conversations. Under these circumstances, considering the various Spanish dialects and the inherent problems in translating the conversations, there was the potential that Spanish-speaking jurors who possessed varying degrees of experience with the particular language or dialect used would rely on their own interpretations of given conversations.
In Gilmore, supra, the issue of whether "a prosecutor's use of peremptory challenges to exclude every black potential petit juror violates a defendant's constitutional right to trial by an impartial jury drawn from a representative cross-section of the community" was addressed. Id. at 516-517. The court held that "Article I, paragraphs 5, 9, and 10 of the New Jersey Constitution forbid a prosecutor to exercise peremptory challenges to remove potential petit jurors who are members of a cognizable group on the basis of their presumed group bias...." Id. at 517. However, the court noted that "... this *291 impermissible presumed group bias is distinguishable from a prosecutor's exclusion of members of a cognizable group for valid, articulated, trial-related reasons." Id. at 531. The court also set forth certain guidelines, including a requirement that a defendant who raises such a challenge must present his objection to the prosecutor's use of peremptory challenges prior to the jury being sworn. Id. at 535. At that point a rebuttable presumption arises that the prosecutor properly exercised his peremptory challenges, and defendant must make a prima facie showing that the challenges were utilized on constitutionally-impermissible grounds. Id. at 535. Thereafter the State "must articulate `clear and reasonably specific' explanations of its `legitimate reasons' for exercising each of the peremptory challenges." Id. at 537.
In this case, the State exercised its peremptory challenges by excluding a Cuban, who spoke Spanish; a non-Hispanic who stated she taught high school Spanish; a Cuban who wrote and spoke Spanish; a native Puerto Rican who spoke Spanish, although mostly at work, and a Haitian who said that Colombians lived on his block and he spoke a little Spanish. The defendants did not object to the jury selection process or the use of the peremptory challenges by the prosecutor until after the jury was sworn. The trial judge responded to the objection by stating:
By the way, let's get something clear for the record. I think we all agree that we all wanted to know where the people did speak Spanish because that was something we agreed on, we wanted to find out that. In fact I think it was a request put to me at the very outset.
* * * * * * * *
Because of the fact that we're going to have interpreters and something on tape in Spanish, we at least wanted to know whether or not people might be second-guessing the interpreters or otherwise. I think it was important to find out so I asked all the jurors if they spoke Spanish, and several of them did.
The prosecutor responded by stating that he knew of no New Jersey case under which a judge could force the assistant *292 prosecutor to state why peremptory challenges were exercised.[5]
Here, the State concedes that Spanish-speaking jurors were excluded, but not on the basis of ethnicity. Thus, if a juror of Spanish ancestry who did not speak Spanish was on the panel, he would not have been excused. However, Spanish-speaking jurors without Spanish ancestry (such as the Spanish teacher) were excluded. The State explains that much of its evidence came from translations of Spanish conversations and questions of Colombian dialect were anticipated to potentially arise. Hence, the State wanted all the jurors to be operating on the same basis without having some jurors who thought they had greater knowledge of the Spanish usage and language than the translators who might be presented by the State and defendants. The substance of the Spanish telephone conversations was a serious issue during the trial. Defendants had the full opportunity to present their own translations and interpretations. Hence, this case does not fall within the ambit of Gilmore. Defendants were in no way deprived of a fair trial.[6]
We note in passing the continuing criticism and problems that *293 have arisen[7] regarding peremptory challenges which are authorized by N.J.S.A. 2A:78-7.[8] Moreover, N.J.S.A. 2A:72-7 makes it a misdemeanor to discriminate and precludes disqualification of jurors on the basis of "race, color, creed, national origin, ancestry, marital status or sex...." Gilmore's standards are equally applicable to the exercise of peremptory challenges. It is only one of several cases in recent years which has highlighted the problems inherent in the use of peremptory challenges. Indeed, attorneys for the State are also with increasing frequency now questioning the attempts of defense counsel to mold the jury to be one favorable to the defendant. The court in State v. Alvarado, 221 N.J. Super. 324 (Law Div. 1987), imposed a State v. Gilmore rule on defendants. See also Editorial, 117 N.J.L.J. 338 (1986) (criticizing the use of peremptory challenges). The problems associated with the use of peremptory challenges were also discussed in Batson v. Kentucky, 476 U.S. 79, 126, 106 S.Ct. 1712, 1738-39, 90 L.Ed.2d 69, 107 (1986) (O'Connor, J., concurring) ("Once the court has held that prosecutors are limited in their use of peremptory challenges, could we rationally hold that defendants are not?"). Indeed, Justice Marshall in his concurring opinion in Batson stated:
The inherent potential of peremptory challenges to distort the jury process by permitting the exclusion of jurors on racial grounds should ideally lead the Court to ban them entirely from the criminal justice system. See [J. Van Dyke, Jury Selection Procedures at 167-169 (1977)]; Imlay, Federal Jury Reformation: Saving a Democratic Institution, 6 Loyola (LA) L Rev 247, 269-270 (1973). Justice Goldberg, dissenting in Swain, emphasized that `[w]ere it necessary to make an absolute choice between the right of a defendant to have a jury chosen in conformity with the requirements of the Fourteenth Amendment and the right to challenge peremptorily, the Constitution compels the choice of the former.' [Swain v. State of Ala.] 380 U.S. 202 at 244, 13 L.Ed.2d 759, 85 S.Ct. *294 824 [at 849]. I believe that this case presents such a choice, and I would resolve that choice by eliminating peremptory challenges entirely in criminal cases. [Id. at 107, 106 S.Ct. at 1728, 90 L.Ed.2d at 94-95].
We note also that in addition to making the argument that such challenges permit exclusion of jurors on racial grounds, such challenges also tend to allow exclusion on the basis of other impermissible grounds such as age, sex and physical handicap. Although we point out these problems inherent with the use of peremptory challenges, we conclude that under the circumstances here, and as long as peremptory challenges are permissible, there was no reversible error. A juror's ability to understand the Spanish language may well have affected his or her evaluation of the proofs in this case. We conclude that the State's reason for exclusion was predicated on valid, articulated, trial-related reasons rather than on the basis of the potential juror's presumed group bias. This does not run counter to the principles of Gilmore.

II
Defendants also claim that the affidavit did not establish sufficient probable cause to warrant a wiretap order. They argue that normal investigative procedures had not been shown to be potentially unsuccessful, and that probable cause did not exist either for the initial telephone company wiretaps or the subsequent State wiretaps. Contrary to defendants' arguments, there was sufficient probable cause for both of these wiretaps. Moreover, with respect to the State wiretap, it had been shown that other investigative means were insufficient, and there was reasonable intrinsic and extrinsic minimization.
The telephone company had initially tapped the line because Pemberthy had used a "blue box" enabling long distance calls to be placed bypassing the normal billing procedures. Pemberthy claims that the actual listening to conversations, as opposed to recording the numbers or merely the salutations, would have protected the telephone company and not alerted it to the contents of calls which defendants claim *295 were later misinterpreted by the police. Even if we agreed with defendants' argument, and we do not, any such error by the telephone company would not result in the suppression of evidence unless there had been State action. See State v. Droutman, 143 N.J. Super. 322, 332 (Law Div. 1976); see also United States v. Goldstein, 532 F.2d 1305, 1311 (9th Cir.1976), cert. den. 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976). No State action has been established here with respect to the telephone company's activity.
The fact that information supplied by the telephone company was included in the detective's affidavit in connection with the wiretap application was not error. Avoidance of payment for toll telephone calls by use of a "blue box" results in a theft of telephone company property. See United States v. Freeman, 373 F. Supp. 50, 52 (S.D.Ind. 1974), aff'd 524 F.2d 337 (7th Cir.1975), cert. den. 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976); see also State v. Hunt, 91 N.J. 338, 347 (1982). Under N.J.S.A. 2A:156A-4 a, as well as its Federal counterpart, 18 U.S.C.A. § 2511(2)(a)(i) a telephone company may intercept communications when it is "a necessary incident to the rendition of ... service or to the protection of the rights or property" of the carrier or provider of such communication. Thus, telephone calls cannot be made except through the telephone company's facility and without payment for the service. In order to protect this property right, the telephone company may "intercept, disclose or use that communication." See N.J.S.A. 2A:156A-4 a.
We reject the further argument that the telephone company's interception was too intrusive. Under N.J.S.A. 2A:156-4 a "a far more intrusive type of activity than [a] trace" is sanctioned. State v. Droutman, supra 143 N.J. Super. at 333. The telephone company must necessarily be able to establish that it has been fraudulently deprived of moneys due, that its billing procedures were bypassed, that completed calls were made, and the identity of the person or persons placing the illegal calls. A recorder was attached by the telephone company to verify that *296 the calls were being completed and to identify the illegal caller. The difficulty of identifying the caller in light of the language used, and the changes in identity obviously warranted more complete recording than merely the time and place of call and the phone locations on each end of the call. We are satisfied that what occurred here was reasonable. See United States v. Auler, 539 F.2d 642, 646 (7th Cir.1976), cert. den. 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977); United States v. Harvey, 540 F.2d 1345, 1351 (8th Cir.1976). Cf. Bubis v. United States, 384 F.2d 643, 648 (9th Cir.1967) (three-month monitoring period unreasonable). Here, the duration of the telephone company's interceptions was not extensive. They occurred during a five-day period. The monitoring was for a length of time which was reasonable and necessary to acquire evidence of illegal use of the telephone facility.
Moreover, the calls intercepted appear relatively limited in scope. The initial conversations recorded were still part of the salutation stage and their disclosure to the State was appropriate. The information could properly be used by the State as part of its basis for obtaining a wiretap order. See United States v. Auler, supra 539 F.2d at 646. Hence, the translations of the conversations recorded during the telephone company's wiretap were properly included in the State's affidavit in support of its application for a wiretap.
Even if we considered the evidence obtained by the monitoring of the "blue box" conversations improperly provided to the police by the telephone company, there is sufficient independent evidence in the affidavit to sustain the wiretap order. State v. Ortense, 174 N.J. Super. 453, 454-455 (App.Div. 1980). The affidavit of the detective in connection with the wiretap application indicated that efforts to introduce an undercover officer to Pedro Pena (Pemberthy) and have him infiltrate the operation failed and continued efforts were hindered by the arrest of one Dominic "Sonny" Robertozzi. United States v. Vento, 533 F.2d 838, 850 (3d Cir.1976); United States v. Spagnuola, 549 F.2d 705, 711 (9th Cir.1977); see also State v. *297 Benevento, 138 N.J. Super. 211, 214 (App.Div. 1975), certif. den. sub nom. State v. Cerbo, 70 N.J. 276 (1976) (sufficiency of affidavit). The affidavit presented an adequate basis to establish that normal investigative techniques had been tried and failed. It was reasonable for the affiant to conclude that further efforts to introduce an undercover officer would not be productive because "the arrest of Dominic Robertozzi and others ... heightened the suspicion of Pedro Pena." Indeed, continued efforts to introduce an undercover agent might have resulted in failure of the entire investigation. See State v. Christy, 112 N.J. Super. 48, 64 (Law Div. 1970). The affidavit stated that normal investigative techniques would be unsuccessful because the person then referred to as Pedro Pena used different names, i.e. Negro and Philipe, used different vehicles and a signaling device. The surreptitious activities of this individual rendered physical surveillance alone extremely difficult if not impossible. See id. at 64-65; see also United States v. Vento, supra 533 F.2d at 850. Moreover, normal investigative means were tried and found to be unsuccessful in the Robertozzi investigation. Thus, it was argued that they would not be successful in the Pemberthy investigation. We find such reference to the prior investigation to be appropriate. See State v. Braeunig, 122 N.J. Super. 319, 326-327 (App.Div. 1973).
United States v. Santora, 600 F.2d 1317 (9th Cir.1979), mod. in part 609 F.2d 433 (1979), relied upon by Pemberthy, is inapposite. The court there was concerned with the validity of four interception orders and "[n]o showing was made that normal investigative techniques would be unlikely to uncover the activities of the other alleged conspirators whose telephones were tapped...." Id. at 1322. Here, the affidavit amply established the unlikely success of alternate investigative techniques. Santora merely establishes that reference to a prior wiretap alone is insufficient. In our view, the affidavit fully complied with the requirements of N.J.S.A. 2A:156A-9 c(6). Hence, the application for a warrant was proper. The affidavit provided a reasonable basis for the judge to find that the *298 organization could not be infiltrated, as that had been attempted. See State v. Christy, supra 112 N.J. Super. at 64-65.
Pemberthy argues that since the expertise of two of the investigators, Diaz and Martinez, was not shown, the translations they provided could not establish the probable cause necessary to satisfy N.J.S.A. 2A:156A-10. These investigators translated the intercepted conversations provided by the telephone company from Spanish to English. The affidavit noted that they had served as monitors during the Robertozzi investigation and translated telephone conversations from Spanish to English in connection therewith. While Pemberthy acknowledges in his brief that the investigators were versed in Spanish, he appears to essentially argue that they should have been versed in Colombian dialect. No authority is stated for this proposition, and we have not found any requirement for this. Notwithstanding that a few "colloquial expressions" might not be appreciated by someone not totally conversant with a dialect, the overall import of the conversations could be established. There is no basis for concluding that the investigators were not qualified to translate the interceptions from the telephone company.

III
We turn now to the argument that the monitors failed to comply with the minimization requirements of N.J.S.A. 2A:156A-12. The purpose of minimization is to safeguard an individual's right to privacy. As stated in State v. Catania, 85 N.J. 418, 429 (1981):
There are two basic approaches to minimization, `extrinsic' and `intrinsic.' `Extrinsic' minimization is accomplished by simply limiting the hours and total duration of interception, while `intrinsic' minimization is accomplished by terminating the interception of individual phone calls within those hours as it becomes apparent to the monitors that the call is not relevant to the investigation.
The initial wiretap order allowed 24 hour a day interception, seven days a week and provided that "[a]ll reasonable efforts will be made whenever possible to reduce the hours of *299 interception." Moncada and Pemberthy assert that the State did not extrinsically minimize since the hours of interception were not specified in the order. This issue was not raised below. R. 3:10-2; R. 1:7-2. In any event, their contention is without merit. As stated in State v. Sidoti, 120 N.J. Super. 208, 213 (App.Div. 1972):
We agree with the reasoning in State v. Christy, 112 N.J. Super. 48 (Law Div. 1970), that a wiretap order, similar to the one here in question, which did not specify the hours of interception and which limited the period to 30 days, was valid. While it is desirable for an order to be more specific as to which person's communications are to be intercepted, what hours of the day and the number of days the tap should last, bookmaking is a continuing operation carried on with a myriad of persons, thus defying such specificity.
It should be obvious that a conspiracy to import and distribute narcotics "is a continuing operation carried on with a myriad of persons." Hence, specificity of hours is neither required nor reasonable. Moreover, on or about the fourth day of the wiretap, the hours of interception were changed to 7 a.m. to midnight. The affidavit which was submitted to the wiretap judge in support of an extension of the wiretap order advised the judge of the change in hours, but pointed out that based on the intercepted communications to date, there was a likelihood that calls would be placed to arrange drug shipments during other hours. Thus, the extension order, as well as a subsequent extension order, continued to permit 24 hour interception, seven days a week. The actions by the State in attempting to limit interception hours to between 7 a.m. and midnight was adequate compliance with the orders and the intent of N.J.S.A. 2A:156A-12 f. The type of conspiracy involved here must not be overlooked. There were day-to-day dealings with drug shipments, and making arrangements for transportation which involved various family members.
Catania rejected a purely extrinsic approach to minimization. 85 N.J. at 431-432. The Supreme Court determined that intrinsic as well as extrinsic minimization was necessary to safeguard defendants' rights. Id. at 432.
Additionally, we find that the monitors exercised subjective good faith in their minimization efforts and their efforts *300 were objectively reasonable. State v. Johnson, 42 N.J. 146, 161-162 (1964). The majority of the monitors in this case had been instructed on the criteria set forth in Catania, and the other two monitors were experienced and knew of the Catania guidelines. They were told they should either completely terminate the telephone conversation if it was only a personal matter being discussed or spot-monitor. However, because the Pemberthy telephone was equipped with call-waiting, the monitors were also aware that spot-monitoring "would have to be used in almost every conversation because the parties might change without [their knowledge]." The record discloses that spot-monitoring was used, and this is "highly persuasive evidence of a good faith intention on the part of the monitors to minimize." State v. Catania, supra 85 N.J. at 446.
The fact that entire conversations of brief duration were recorded, especially at the beginning of the investigation, did not affect the overall intent to minimize. Moreover, since various family members were involved in the conversations and many of the calls involved coded language references, as well as the language problem, the investigators could reasonably conclude that the conversations were pertinent. In addition, more extensive monitoring was necessary to assist in pinpointing Pemberthy's location because of the difficulty of using conventional surveillance methods.
The record supports the conclusion that objective reasonableness was demonstrated. Out of the 271 telephone calls, 211 were deemed pertinent. Fifteen of the nonpertinent, nonminimized calls were one minute or less in duration; seven were two minutes in duration; three were three minutes in duration. Broad interception was justified because a drug conspiracy was involved and it was necessary to ascertain the full scope of the conspiracy and identify the participants. Obviously, the monitors could reasonably expect that a given call would pertain to the drug conspiracy. Id. at 435. Reasonableness was clearly demonstrated. Moreover a solely objective, post-hoc approach was not used. Id. at 443.

*301 IV
The defendants argue that the judge improperly qualified two of the State's witnesses as experts and allowed them to testify in areas beyond the scope of their knowledge. Trooper Cardenosa was offered as an expert "in the field of narcotics investigation and familiar with the type of language used and the manner of speaking during a narcotics transaction over the phone by Spanish-speaking people." At an earlier point in the trial the judge had declined to qualify Cardenosa as an expert in Spanish language. When he was offered as an expert in narcotics investigation, the defendants objected. The court conducted a voir dire during which the witness testified to his experience and qualifications. He testified that he was familiar with the organizational structure of cocaine operations, with the type of language used, and codes used by Spanish-speaking individuals dealing in cocaine. On cross-examination he admitted that he never testified before as an expert. The judge accepted his qualifications and allowed him to testify as an expert. See Evid.R. 56(2).
Although defendants point out that the witness "opined that Spanish drug investigations were no different than any other," this is irrelevant because the witness was not qualified with respect to the type of language used, but as an expert in narcotics investigations. Obviously, the question of an expert witness' qualifications are within the sound discretion of the trial judge. See State v. Kelly, 97 N.J. 178, 209 (1984); State v. Chatman, 156 N.J. Super. 35, 40-41 (App.Div. 1978), certif. den. 79 N.J. 467 (1978). The judge instructed the jury that the credibility and weight to be given the testimony of the expert was within their province. It is presumed that the jury followed the judge's instructions. State v. Manley, 54 N.J. 259, 271 (1969).

V
We have considered defendants' remaining arguments and conclude that they are without merit. R. 2:11-3(e)(2). We *302 add only the following comments. When the judge determined that Cardenosa was qualified to testify as an expert, he stated in the presence of the jury: "I am rather impressed with his qualifications and what he knows about drugs." When Moncada's attorney objected, the judge responded: "When I say impressed, this will be an appeal point, who knows." He then proceeded to issue the following curative instruction to the jury:
I don't make the fact questions. I'll withdraw the fact I said I was impressed. Frankly I don't mean it that way. What I mean is that it's not for me to give my approval, disapproval to his testimony, you must do that, and in fairness to defense of me have being impressed not a good word. I would say this, based on my experience in hearing cases of this type and hearing other people testify, I think he has sufficient experience to be considered an expert in the area. You have to determine what weight you give to that, and if you find the facts are not backed up in this call, and the fact he says something means something, you must determine in finding what you think it means and counsel for the defense are very right in that respect. You'll have to determine, figure out what it really means. Fact he says it means A, B, and C doesn't mean you have to accept that, but I do think at least he's qualified enough to talk about it, otherwise I would say he was not. All right? And that's all I do in this ruling. I am ruling that in my judgment he's qualified to testify as an expert in the area of narcotics investigation.
Although the judge's comment before the jury about being impressed would better have been left unsaid, we find no error in his denial of the requested mistrial. State v. Winter, 96 N.J. 640, 646-647 (1984). The judge's instruction, as well as his additional instruction at the end of the case when he told the jury that it was not bound by either the comments of counsel or the court on the facts and that the rulings of the court were not intended to indicate how the case should be determined, but rather that the determination of the facts was solely their province, was adequate to cure any error. As we have already noted, the jury is presumed to have followed those instructions. State v. Manley, supra 54 N.J. at 271.
Additionally, we note that it was within the court's discretion to have allowed the bag of cocaine to be taken as an exhibit into the jury room. While testimony might have indicated the size, weight and appearance of a kilogram of cocaine, the actual substance was admissible and its presence in the jury *303 room was not erroneous. The same applies with respect to the Venezuelan passport bearing defendant's picture in the name of "Reyes" and the airline boarding passes in that name. They were properly admissible as evidence against Moncada. Likewise, the nearly $90,000 found in the possession of the defendants was properly admitted considering the telephone discussion with respect to assembling 9 "points" explained as representing $90,000 for an apparent drug transaction. We also observe that the defendants failed to object to the supplemental conspiracy charge. Hence, they are precluded from raising that issue on appeal. However, with respect to the merits, the judge's instructions were adequate and there was no basis for a claim of reversible error.
We find no abuse of sentencing discretion and no violation of the sentencing standards. State v. Roth, 95 N.J. 334, 363-364 (1984); State v. Hodge, 95 N.J. 369, 374-375 (1984); State v. Sainz, 210 N.J. Super. 17, 24 (App.Div. 1986). The sentences were clearly warranted, and we find no compelling circumstances warranting our interference with a sentence which was within the judge's sentencing discretion.
Affirmed.
NOTES
[1] Although Moncada had been indicted for the same offenses, except for theft of services, he was only convicted of conspiracy to distribute and possess with intent to distribute more than one ounce of cocaine.
[2] Neither the State nor any defendant has challenged the trial court's determination on merger. Since the maximum sentences applicable to the conspiracy does not differ from that regarding the substantive offenses, we have no occasion to address the matter. N.J.S.A. 24:21-24.
[3] State v. Driver, 38 N.J. 255 (1962).
[4] A "blue box" is a device which "circumvents the billing system of telephonic communications carriers and allows a caller to place long distance calls without charge." United States v. Harvey, 540 F.2d 1345, 1347 (8th Cir.1976).
[5] The jury was selected from June 14 through June 18, 1984. The Appellate Division decided State v. Gilmore, 195 N.J. Super. 163 (App.Div. 1984), on May 21, 1984. In that decision this court ordered a remand for a hearing to establish the identity of the prospective jurors and to afford the prosecutor an opportunity to establish motive or reasons for peremptorily excusing certain jurors. It was not until this court's second decision in State v. Gilmore, 199 N.J. Super. 389 (App.Div. 1985) (decided March 8, 1985) that it was held that the systematic exclusion based on race was impermissible. The Supreme Court affirmed at 103 N.J. 508 on July 16, 1986.
[6] Although the State argues that defendants raise this argument after the jury was sworn and hence were out of time, we note that our Supreme Court had not decided Gilmore at this time. Hence, we prefer to deal with the issue on the merits, notwithstanding that N.J.S.A. 2A:78-6 states that "[n]o exception to any juror, grand or petit, on account of his citizenship, age or other legal disability shall be allowed after the juror has been sworn." Nor do we apply here N.J.S.A. 2A:78-9 which requires: "[a]ll challenges to jurors, for any cause whatever, in any action, civil or criminal, may be made at any time before the juror is sworn."
[7] In many instances peremptory challenges are being used not to select an impartial jury but to assure the most favorable jury for a party.
[8] Indeed, a new "expertise" and industry of investigation and analysis of potential jurors has sprung up based on demographics, background, culture and potential psychological factors.