**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0736-19

CARLOS CARRANZA,

     Appellant,

v.

BOARD OF REVIEW,
DEPARTMENT OF LABOR
and BUCKINGHAM ADULT
MEDICAL DAY CARE
CENTER, LLC[1]

     Respondents.

_____

Submitted February 10, 2021 – Decided February 25, 2021

Before Judges Whipple and Rose.

On appeal from the Board of Review, Department of Labor, Docket No. 186,368.

Carlos Carranza, appellant pro se.

Gurbir S. Grewal, attorney for respondent, Board of Review (Sookie Bae, Assistant Attorney General, of

_____

[1] Improperly pled as Buckingham AMDC, LLC.

counsel; Dipti Vaid Dedhia, Deputy Attorney General,
on the brief).

PER CURIAM

Claimant Carlos Carranza appeals pro se from a September 12, 2019 final decision of the Department of Labor and Workforce Development, Board of Review, disqualifying him from receiving unemployment benefits under N.J.S.A. 43:21-5(a). The Board's decision was based on its determination that Carranza left work voluntarily without good cause attributable or related to the work. Because the factual circumstances were not sufficiently developed at the Appeal Tribunal hearing, we reverse and remand for a new hearing.

We summarize the facts we can discern from the transcript. Carranza was employed full time as a maintenance worker for Buckingham Adult Medical Day Care Center, LLC in Prospect Park from December 1999 to May 28, 2019. At the time of the telephonic hearing on July 24, 2019, Carranza was seventy-eight years old and spoke limited English. The appeals examiner denied Carranza's request for his daughter to serve as his translator, but immediately contacted a Spanish interpreter, who also appeared telephonically. Carranza testified on his own behalf, but did not present any other witnesses or introduce in evidence any documents. Buckingham did not participate in the hearing.

Prior to administration of the oath, Carranza acknowledged he was ready to proceed. But he specifically asked that the appeals examiner "give [him] more time because it's difficult for [him] sometimes to hear, and [he] would like to have enough time to answer each question." The examiner agreed to do so.

When the examiner asked whether Carranza or his employer "initiate[d] the separation" on May 28, 2019, the following exchange transpired:

> INTERPRETER: What happened . . . what happened that day was my employer called me to talk to me. And I went and I told that person that I couldn't continue working because the woman that was working with me was harassing me (inaudible) was having an issue with me.
>
>      . . . .
>
> EXAMINER: So, did you resign?
>
> INTERPRETER: The interpreter requires . . . (Speaking Spanish). The interpreter needs to look up a word. (Speaking Spanish).
>
> CARRANZA: (Speaking Spanish).
>
> INTERPRETER: Yes. Yes. I resigned. But if you ask one question, I am going to answer that, but there are other things that happened before.
>
> [(Emphasis added).]

Upon further questioning, Carranza clarified that he "resign[ed]" to "Lauren," who was the "owner" of Buckingham, and "Selena" was the woman

who had harassed him. Selena held a "higher position than [Carranza]"; she was "like the principal" or "director" of Buckingham. When asked to explain how he felt harassed, Carranza eventually disclosed that Selena "suspended [him] for three days without any reason." Carranza said it was the first time in his twenty-year employment history with Buckingham that he was suspended.

Carranza indicated his suspension was precipitated by an incident that occurred on May 22, 2019, when a hairdresser asked him for the key to "that place where you can find the bathroom paper and all those objects." Carranza said Lauren suspended him because he refused to obtain the key to that room. Carranza elaborated:

> I said that was her work and not my work because I needed to go to another place. And that lady said to me. "No. I'm doing (inaudible)." And I said, "That's your work and you get paid for that." So that lady went to the principal and said what happened, and the principal didn't help me with what I was saying, so I got suspended for three days.

When asked whether he resigned because Lauren suspended him or because he felt Selena had harassed him, Carranza ultimately testified:

> I'm going to tell you the truth. I think the new reason I resigned it [sic] was because I was discriminated [sic]; because I think that this is a racist person. And that lady doesn't try to look at me [sic]. And also she has been through a [sic] many, many

A-0736-19

injustices with me.  So, I don't know if you want me to tell you how that happened?

Carranza acknowledged that prior to resigning, he did not speak with Lauren to resolve his issues with Selena.  In that regard, Carranza stated:

> Well, you may know that I don't speak English and when you [sic] want to say something you want me [sic] an interpreter.  And if I, for example, was going to say what happened they will realize what was happening, and everybody will know.  So, in that case I prefer to . . . I prefer not to say what was happening.

When pressed, Carranza said "[Lauren] knew everything about it.  And everybody knew what was happening.  [Selena] was being hard with me."  As an example, Carranza stated:

> If I have to take a patient to other [sic] place at 9:00 a.m., I was already working . . . since 6:00 a.m.  And if I was (inaudible) she was looking for something else to make sure I was not going to be resting.  So, I think that's not normal for a person to be . . . to have that behavior like that.

Following the hearing, the Tribunal issued a written decision, concluding Carranza resigned "because he believed he was being treated unfairly."  Specifically, Carranza claimed his "co-worker [sic] created a hostile work environment."  In reaching her decision, the examiner found Carranza "did not address any of his concerns with the owner prior to his resignation."  She also found "[c]ontinuing work was available at the time he left."  (Emphasis added).

A-0736-19

Carranza appealed pro se to the Board. According to an undated electronic entry, Carranza asserted, among other things: "[M]y [s]upervisor from Buckingham has discriminate[d] against me. I think because of my age the [s]upervisor has taken advantage of me. I have complained about this and no action was ever taken." Citing examples of his complaints, which he described as "bullying," Carranza stated, "I ha[d] no one to help me with the language barrier not being able to speak English." In sum, he said he left his job "because of not being heard or understood and of course discrimina[tion]."

In his accompanying August 5, 2019 correspondence to the Board,[2] Carranza reiterated his contention that his supervisor discriminated against him. Carranza also claimed he "forgot to state all that happen[ed]" during his hearing before the Tribunal. For the first time on appeal to the Board, Carranza contended "[t]he main reason why [he] was terminated was because of low census." Instead, he focused on his mistreatment by his supervisor. Apologizing for the confusion, Carranza elaborated:

> I am [seventy-eight] [y]ears old[.] I forget things and focus only [sic] one thing. I also want to say I have a hard time hearing on the phone. Yes I have issue [sic] with my [s]upervisor[;] yes I felt discrimination [sic]

---

[2] Although it is not entirely clear from the record, we glean from the briefs on appeal that Carranza's August 5, 2019 letter was submitted as part of his appeal to the Board together with Carranza's electronic entry.

A-0736-19

by her. The main reason of my let go [sic] was due to low census. The [o]wner of the [c]ompany[,] Lawrence[,] terminated [sic] due to low census.

The Board thereafter summarily adopted the Tribunal's decision. This appeal followed.

On appeal, Carranza reprises the arguments asserted before the Board. In addition, for the first time on this appeal, Carranza claims Buckingham terminated his employment on May 29, 2019, "due to lack of work." To support this belated contention, Carranza included in his appendix what purports to be a one-page letter from Buckingham to Carranza. The "[o]bject [sic]" of the letter is: "Notice of layoff." The letter states, in full:

> We had been hoping that during this difficult period of time we could keep all of our employees with the company. Unfortunately, this is not the case.
>
> It is with regret, therefore, that we must inform you that we will [sic] unable to utilize your service after 05/29/2019. We would like to inform you that your employment with Buckingham Adult Medical Day Care Center will be terminated due to lack of work.
>
> Please accept our best wishes for your future endeavors.

The correspondence is undated and purportedly signed by "Zarina Segal . . . Administrator" and "Lawrence Krasne . . . LLC Member." The letter is

A-0736-19

addressed to Carranza at a street address that does not appear elsewhere in the record.

As a threshold matter, we will not consider issues that were not properly presented to the agency when the opportunity was available "unless the questions so raised on appeal go to the jurisdiction of the trial court [or agency] or concern matters of great public interest." Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973); see also In re Stream Encroachment Permit, 402 N.J. Super. 587, 602 (App. Div. 2008) (observing we will not consider issues that were not raised before an administrative agency unless they are of public importance). Because the letter was not presented to the Tribunal for consideration, it is inappropriate for consideration on appeal. See Zaman v. Felton, 219 N.J. 199, 226-27 (2014). Indeed, we cannot "fill in missing information on [our] own." N.J. Dep't of Children & Families, Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 28 (2013).

Turning to the issues raised before the Board, it is well settled that the claimant bears the burden of proving he is entitled to unemployment benefits. Brady v. Bd. of Review, 152 N.J. 197, 218 (1997). To qualify for benefits, an employee who has left work voluntarily must establish he did so for "good cause attributable to work." Ibid.; N.J.A.C. 12:17-9.1(c). Although the statute does

not define good cause, it has been construed "to mean 'cause sufficient to justify an employee[] . . . joining the ranks of the unemployed.'" Domenico v. Bd. of Review, 192 N.J. Super. 284, 287 (App. Div. 1983) (citation omitted). The administrative regulation defines good cause as "a reason related directly to the individual's employment, which was so compelling as to give the individual no choice but to leave the employment." N.J.A.C. 12:17-9.1(b).

We have held the employee's failure to complain about the actions of his alleged offender "may be relevant and probative on the bona fides" of a claim. Doering v. Bd. of Review, 203 N.J. Super. 241, 248 (App. Div. 1985). See also Cokus v. Bristol Myers Squibb Co., 362 N.J. Super. 366, 379-80 (Law. Div. 2002) (stating whether an employee has resorted to internal grievance procedures is a relevant factor in determining whether harassment has created an intolerable situation that compelled an employee to transfer). But the failure to complain "certainly does not in and of itself disqualify [a claimant] from receiving benefits nor does it prove that the reason she quit was not sufficient to constitute 'good cause attributable to such work.'" Doering, 203 N.J. Super. at 248-49.

Our review of administrative agency decisions is limited. In re Stallworth, 208 N.J. 182, 194 (2011). But that review requires a record that enables us to

answer the question of whether the agency's factual findings are supported by sufficient credible evidence. See Lourdes Med. Ctr. of Burlington Cty. v. Bd. of Review, 197 N.J. 339, 367 (2009). If we cannot determine from a review of the transcript whether the hearing examiner's factual findings were supported by the record, or whether the Board's ultimate decision was supported by the record, we obviously cannot fairly decide the appeal.

Specifically, the transcript of the hearing – which spans fewer than thirty pages – illustrates much confusion and miscommunication. The term, "inaudible" appears seventeen times. The interpreter requested repetition of a statement six times, and twice required time to "look up" terms. Notably, the interpreter indicated she was researching the meaning of a word immediately after the examiner asked Carranza: "So did you resign?" Throughout the hearing, the examiner interrupted the proceedings to: request the interpreter "interpret what [Carranza] said so far"; remind Carranza he could not speak before the interpreter translated his statements; and refocus Carranza, instructing him to answer her questions directly.

Accordingly, our resolution of the issues on appeal is hampered because the transcript of the hearing in this matter raises a substantial doubt as to whether Carranza understood the questions posed and whether his responses were

accurately interpreted. In turn, the circumstances underscoring Carranza's reasons for leaving, and whether he had an adequate opportunity to address those reasons with his employer such that the employer was aware of his reasons, are also unclear. The lack of effective communication between Carranza and the interpreter, and ultimately between Carranza and the examiner, appears to have impaired Carranza's opportunity for a fair hearing before the Tribunal. See Alicea v. Bd. of Review, 432 N.J. Super 347, 352 (App. Div. 2013) ("We have repeatedly acknowledged the important role that proper translation into the language of the litigant plays in our legal system.").

Although we acknowledge the difficulties inherent in telephonic interpreter-assisted hearings, we nonetheless require a cleaner record than currently is available. We are therefore constrained to remand for a new hearing. On remand, the Board shall ensure that the interpreter utilized speaks the same dialect as Carranza to avoid any confusion on rehearing, and that Carranza understands the interpreter. See State v. Pemberthy, 224 N.J. Super. 280, 290 (App. Div. 1988) (recognizing "the various Spanish dialects and the inherent problems in translating the conversations" at issue).

To ensure an accurate transcript is created, Carranza shall wait until the interpreter has completely translated the examiner's questions before

responding. Carranza also must inform the examiner if he cannot hear the questions presented, or if he needs more time to answer.

Further, because the Tribunal concluded "[c]ontinuing work was available at the time [Carranza] left [Buckingham]," and the examiner did not have the opportunity to review and consider the undated letter purportedly sent to Carranza from Buckingham, Carranza shall have the opportunity to admit the letter in evidence at the rehearing. The burden of proving the authenticity of the letter, the date on which it was sent, and whether the letter had any bearing upon his termination remains upon Carranza. Brady, 152 N.J. at 218.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION