**Gabriel PEMBERTHY, Petitioner,**

v.

**Howard L. BEYER, et al., Respondents.**

**Civ. A. No. 89–106.**

United States District Court,
D. New Jersey.

Sept. 16, 1992.

Alan L. Zegas, West Orange, N.J., for petitioner.

Annmarie Cozzi, Deputy Atty. Gen., Div. of Criminal Justice, Appellate Bureau, Trenton, N.J., for respondents.

## OPINION

SAROKIN, District Judge.

Petitioner Gabriel Pemberthy seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] He bases his claim on the State's alleged racially discriminatory use of peremptory challenges in violation of Petitioner's Sixth Amendment right to trial by an impartial jury and Fourteenth Amendment rights to due process and equal protection of the laws. Petitioner is a man of Latino descent challenging the exclusion of all Latino venirepersons from the jury chosen to hear his case.[2]

## FACTUAL BACKGROUND

### Voir Dire and Trial

Petitioner's state criminal trial involved conversations recorded in Spanish and translated into English. The defendants were of Colombian descent, whereas the agents who translated the tapes were of Colombian, Cuban, and Puerto Rican descent. Defense counsel argued in various pre-trial hearings and at trial that certain Spanish idioms have different meanings in different Latin American countries, and thus, some of the State's translations were inaccurate, distorting what was said.

At trial, the State presented one agent of Colombian descent who "corrected" the translations of the tapes. Trans. of 6/22/92 Hearing at 32 (hereinafter "6/22/92 Trans."). The defense did not produce an expert to challenge the State's translations. Instead, the defense challenged the translations via cross-examination of the agents who translated the recordings. 6/22/92 Trans. at 14–15. Thus, the proper translation of the tapes was a disputed issue of fact for the jury to resolve. The trial judge never indicated that

---

**1.** Rigoberto Moncada, a co-defendant at Petitioner's trial, seeks the same relief. *Moncada v. Rafferty, et al.,* Civ. No. 89–1276 (HLS) (D.N.J.). The co-defendants have filed separate habeas petitions with this court, making substantially the same claims based upon the facts from the same trial. As a result, the following opinion equally applies to Mr. Pemberthy's and Mr. Moncada's petitions. All citations to papers filed in this case refer to Petitioner Pemberthy's papers unless otherwise designated.

**2.** While the terms "Latino" and "Hispanic" are often used interchangeably, in *Hernandez v. New York,* 500 U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), the U.S. Supreme Court recently chose to use the term "Latino" in deciding a similar issue. In keeping with that Court and in deference to the sense of inclusiveness connoted by the term "Latino" to some in that varied community, *see, e.g.,* Manuel Perez–Rivas, *Hispanic, Latino: Which?,* N.Y. NEWSDAY, Oct. 13, 1991, at 6 (hereinafter "Perez–Rivas"), "Latino" is used throughout this Opinion.

the State's offered translation was the "official" translation for purposes of the trial. *Id.* at 33, 56.

The Assistant Prosecutor assigned to the case, Thomas Simon, asked the trial judge to question each potential juror during the *voir dire* regarding his or her Spanish-speaking ability. *Id.* at 16. The judge obliged, and five venirepersons identified themselves as Spanish-speakers. The prosecutor struck each of these jurors, resulting in a jury without any Latinos.[3] The prosecutor acknowledged that four of these jurors—Quesada, Casanova, Quinones and Bodet—were Latino. The ethnicity of the fifth, Catherine Rocca, a high-school Spanish teacher, was not readily apparent and remains unknown. 6/22/92 Trans. at 18; State's Brief to App.Div. (Moncada) at 19 n. 4.[4]

The judge further questioned one of these jurors, Mr. Casanova, on his ability to accept the submitted translations over his own understanding of the Spanish language.

THE COURT: Anybody among you fourteen people who speak Spanish?

All right, sir.

If you read and write Spanish, too.

MR. CASANOVA: Yes, sir.

THE COURT: How long do you speak it? How well do you speak it?

MR. CASANOVA: Perfect.

THE COURT: Pretty well. Okay.

There will in this case, I know, be a lot of Spanish being spoken. It's going to be, if the jury—if you're on this jury in this case, you're going to hear some tapes of conversations, telephone calls, and they will be in Spanish predominantly.

I will give the jury instructions relative to the law involved in this case. There will be some interpreters in the case.

Would you follow the law as I give it to you, and accept the interpretation as given with respect to the language, and in general follow, as best you can, the case, and not substitute your own versions of what really it's about, but accept what comes through from the Court?

Can you do that?

MR. CASANOVA: Certainly.

THE COURT: See what I mean?

MR. CASANOVA: Yes.

THE COURT: There will be interpreters in this case. There will be a lot of discussion about the language. There will probably be a lot of legal argument about the language as well.

And would you, you feel you could be fair and not attempt to give different interpretation to the meaning of the word if, as a result of the testimony, a word is said to mean such and such, even if you ...

[The remainder of the testimony has not been supplied.] [1]–16 to [2]–25, Pet. Exhibit A. As is evident from the transcript, Mr. Casanova responded that he could accept and follow the court's translation.

The judge also questioned Mr. Quesada regarding his ability to follow the court's instructions on the law, to which Mr. Quesada responded affirmatively. 6/22/92 Trans. at 24. The judge did not question Mr. Quesada regarding his ability to accept the translation. Moreover, the judge did not pursue either line of questioning with respect to jurors Quinones, Bonet, or Rocca.

---

**3.** Based on the testimony adduced at the June 22, 1992 Hearing, the record indicates that the defense struck venireperson Rivera, who was a non-Spanish-speaking person with a Hispanic-sounding last name. 6/22/92 Trans. at 20–21. In addition, the defense also struck two non-Spanish-speaking Portuguese venirepersons. *Id.* at 28–29. Thus, the State's strikes, when combined with defense's strikes, resulted in the exclusion of all Latinos from the jury.

**4.** Although the State admits that Ms. Rocca's ethnicity is unknown (6/22/92 Trans. at 18),

the State nonetheless insists that this court is bound by the Appellate Division's "factual finding" that Ms. Rocca is not Latino. State Supp. Brief at 4, n. 8. However, the Appellate Division made no such factual "finding," *see State v. Pemberthy*, 224 N.J.Super. 280, 291, 540 A.2d 227 (App.Div.1988), nor could it have, since the State admits that the record does not indicate her ethnicity. Thus, this court cannot ignore the explicit admission, confirmed by the record, that Ms. Rocca's ethnicity is unknown.

After the jury was empaneled, defense counsel moved to challenge the jury composition.[5] The defense charged that the prosecutor excused every juror who spoke Spanish or who looked Latino. The defense asserted that the prosecution's use of 12 of its 15 peremptory challenges to bar Blacks and Latinos from the jury (resulting in no Latinos at all and four Blacks on the jury) amounted to systematic exclusion which denied the defendant a fair trial by jury.[6]

DEFENSE: [T]he State used, from my calculation, your Honor, twelve of its 15 challenges to exclude black and Hispanic jurors.

I think, your Honor, there is no question in my mind that from the State's point of view they sought to prevent my client from getting a jury of his peers, and that being Hispanic jurors, and that those challenges were made, your Honor, solely upon the ethnic or racial backgrounds. And, that being the fact, that they were Hispanic ... I'm not sure if this jury, in any event, could ever deliberate in a fashion that they would give my client a fair trial.

. . . . .

I would suggest to your Honor that that is systematic exclusion, and it is that type of exclusion which is prevented.

31T:8–25 to 31T:11–19.

The prosecutor refused to offer a justification for these challenges. He correctly argued that at that time, there was no binding law which could compel him to disclose his motivation for his use of peremptory strikes. 31T:13–18 to 31T:13–22. In the absence of an explanation by the prosecution, the trial judge asserted the possible relevance of Spanish-speaking jurors "second guessing" the English translation of key Spanish conversations.

THE COURT: By the way, let's get something clear for the record. I think we all agree that we all wanted to know [whether] people spoke Spanish because that was something we all agreed on. We wanted to find out that. In fact, I think it was a request put to me at the very outset.

. . . . .

THE COURT: All right.

Because of the fact that we're going to have interpreters, and something on tape in Spanish, we at least wanted to know whether or not people might be second guessing the interpreters, or otherwise. I think it was important to know that. So, I agreed it was important to find out, so I asked all the jurors if they spoke Spanish, and several of them did.

. . . . .

THE COURT: Mr. Simon [for the State], do you want to address yourself to that?
MR. SIMON: Only, your Honor, that I have no New Jersey case which calls for your Honor to ask an Assistant Prosecutor—to force the Assistant Prosecutor to state why he exercised preemptory [sic] challenges.
THE COURT: As I understand it, gentlemen, at least in this point in New Jersey, a preemptory [sic] challenge is a preemptory [sic] challenge, I have no right to say to him you shouldn't exercise that challenge, or why did you exercise that challenge. Frankly, I'm not sure that I saw systematic exclusion of any kind. It is true that there were several people who did speak Spanish, and I didn't follow that closely if they were all excused.
You said they were?
MR. RAINONE [for the Defense]: They were, your Honor.

31T:12–14 to 31T:14–9. The trial judge then denied the defense counsel's motion

5. The Appellate Division forgave petitioner's non-compliance with New Jersey court rules governing timeliness of objections to jurors, since the relevant cases which established petitioner's grounds for objection had yet to be decided at the time of the trial. *State v. Pemberthy, supra,* 224 N.J.Super. at 292 n. 6, 540 A.2d 227. In opposition to the instant petition, the State does not press its argument regarding the timeliness of petitioner's objection. *See* Answer ¶ 12C, pps. 8–10.

6. At the June 22, 1992 Hearing, the Assistant Prosecutor who tried petitioner's case conceded that he had no basis for disputing the fact that 12 of the 15 jurors he struck were Black or Latino. 6/22/92 Trans. at 36.

for a mistrial based upon prosecutorial discrimination.

The jury ultimately convicted petitioner of conspiracy to distribute and to possess with the intent to distribute a controlled dangerous substance; possession of cocaine; possession of cocaine with intent to distribute; and theft of services. He is now serving a life sentence with a 25–year parole ineligibility.[7]

### Post–Trial Proceedings

■ Petitioner filed an appeal with the Appellate Division of the Superior Court of New Jersey on October 24, 1984, which affirmed his conviction. *State v. Pemberthy*, 224 N.J.Super. 280, 540 A.2d 227 (App. Div.1988).[8] The Supreme Court of New Jersey denied petitioner's application for Certification. *State v. Pemberthy*, 111 N.J. 633, 546 A.2d 547 (1988).

Petitioner then filed a Petition for a Writ of Habeas Corpus with this court on January 5, 1989, asserting the three grounds for relief sought in his appellate applications: (1) the State violated petitioner's constitutional rights by failing to minimize and to suppress certain telephone conversations intercepted through a wiretap; (2) the affidavit filed in support of the wiretap failed to establish probable cause, thereby rendering the wiretap unconstitutional; and (3)

petitioner's Sixth and Fourteenth Amendment rights to a fair trial by jury were violated by the State's discriminatory use of its peremptory challenges.[9]

This court dismissed the first and second grounds for relief on the merits in an Order signed on July 27, 1989. In the accompanying Opinion, the court further ruled that the third claim had been exhausted in the State courts, and requested that the parties brief the peremptory challenge issue on the merits. On August 8, 1989, petitioner filed a notice of appeal of the dismissal of his first two claims with the United States Court of Appeals for the Third Circuit. The Third Circuit dismissed the appeal as interlocutory on November 2, 1989.

On May 30, 1991, this court appointed counsel for petitioner for the purpose of briefing the remaining claim based on the State's allegedly discriminatory use of peremptory strikes. The parties completed briefing on March 9, 1992. Upon examining the submissions, the court realized that the prosecutor in petitioner's case had never offered his reasons for the disputed challenges in the context of a *Batson* hearing. Although on appeal, the Attorney General's office offered possible explana-

---

7. Mr. Moncada was sentenced to 30 years in prison with a 15 year period of parole ineligibility. *State v. Pemberthy*, 224 N.J.Super. at 284, 540 A.2d 227.

8. In the period between Petitioner's application to the Appellate Division in 1984 and that court's affirmation of his conviction in 1988, *State v. Gilmore*, 103 N.J. 508, 511 A.2d 1150 (1986) and *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) were decided. Both cases mandated the elimination of all prosecutorial discrimination in the use of peremptory challenges. Yet, while *Batson* is cited in the Appellate Division's opinion, *see State v. Pemberthy*, 224 N.J.Super. 280, 293–94, 540 A.2d 227 (App.Div.1988), that court relied solely on the concurring opinions of Justices O'Connor and Marshall for support of the proposition that peremptory challenges are inherently problematic. The Appellate Division applied the law of *Gilmore*, the state decision, to petitioner's case. This court must examine petitioner's case according to the federal constitutional standards announced in *Batson*.

*Batson v. Kentucky* is applied to petitioner's case retroactively under the Supreme Court's

ruling in *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (the *Batson* rule is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, on April 30, 1986, when *Batson* was decided). *Allen v. Hardy*, 478 U.S. 255, 258 n. 1, 106 S.Ct. 2878, 2880 n. 1, 92 L.Ed.2d 199 (1986) defines "final" as "where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before our decision in *Batson*." Because petitioner's case was under review by the Appellate Division on April 30, 1986, his case was not yet final.

9. In his brief for the Appellate Division, Petitioner also argued that the court's sentence of life imprisonment with a 25–year parole ineligibility, $20,000 fine, $25 penalty in favor of the Violent Crimes Compensation Board, and the additional consecutive 18–month term and $25 penalty for the Violent Crimes Compensation Board for theft of services, was unduly punitive. *State v. Pemberthy*, 224 N.J.Super. at 285, 540 A.2d 227.

tions in defense of the conviction, no court had ever examined the prosecutor's demeanor or inquired as to his actual reasons.

Although the State Appellate Division implicitly accepted the Attorney General's justification for the prosecutor's use of peremptory challenges as presented on appeal, the Prosecuting Attorney himself did not proffer directly any justification for his peremptory strikes. Indeed, the prosecutor never offered any justification either at the time of trial or on the appeal. Rather, the trial court offered an explanation which the State explicitly adopted in its brief to the Appellate Division. The State presses that same explanation in defense of the conviction in this petition for a writ of habeas corpus.

### The Need For a *Batson* Hearing

A State trial judge's determination of intentional prosecutorial discrimination is a finding of fact which must be accorded great deference on review. *Batson v. Kentucky*, 476 U.S. 79, 98 n. 21, 106 S.Ct. 1712, 1724 n. 21, 90 L.Ed.2d 69 (1986); *Hernandez v. New York*, 500 U.S. ——, ——, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395 (1991). The *Batson* Court reasoned that the trial judge relies upon the credibility and demeanor of the attorney in defending his or her actions and, as a result, is in a superior position to make such a finding. *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. Therefore, the trial judge's factual finding should be reviewed with a presumption of correctness. *Id.*

In the present case, however, the trial judge's denial of defense counsel's motion for a mistrial centered on the judge's conclusion that he saw no "systematic exclusion." 31T:14–3 to 31T:14–4. The standard for a finding of systematic exclusion is delineated in the Supreme Court's decision in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), not *Batson*. Because petitioner's trial took place before *Batson*, *Swain* provided the then applicable legal standard for proving purposeful discrimination in the use of peremptory challenges. In *Swain*, the Court held that a *prima facie* case for purposeful discrimination could only be

made by a showing that the peremptory challenge system as a whole had been perverted. *Swain*, 380 U.S. at 223, 85 S.Ct. at 837. This required an extensive showing that the prosecutor discriminated not only in the defendant's trial, but that prosecutors in the jurisdiction generally excluded members of the defendant's race in previous, unrelated trials. *Id.*

The Court's decision in *Batson* overruled that portion of *Swain* which set forth the evidentiary showing necessary to make a *prima facie* case of purposeful prosecutorial discrimination. *Batson*, 476 U.S. at 95, 106 S.Ct. at 1722. The *Batson* Court held that "a defendant may establish a *prima facie* case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96, 106 S.Ct. at 1723. The factual determination made by the trial court in petitioner's case, therefore, is not a factual determination of purposeful discrimination on the part of the prosecutor in jury selection for petitioner's case. That is the claim before this court.

*Batson* directs that the trial judge's factual determination be accorded great deference because of the judge's ability to scrutinize the credibility and demeanor of the prosecuting attorney in defending his or her actions. In petitioner's case, however, since the prosecutor himself did not defend his actions, the trial judge was given no opportunity to examine either his credibility or his actual reasons under *Batson*'s standards. There is, then, no basis for deference to the trial judge's determination, to the extent that he ruled on discrimination by systematic exclusion.

Nor is there any basis for deference to the State appellate court's supposed "factual findings" because, in point of fact, the appellate court made no such findings. The State suggests that this court must defer to the New Jersey Superior Court, Appellate Division's "factual finding" that the prosecutor did not intentionally discriminate in the exercise of his peremptory strikes. State Supp. Brief at 9, 14–15, relying on *Sumner v. Mata*, 449 U.S. 539, 547,

101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981) (federal courts conducting habeas review must give deference to state appellate court factual findings). However, the Appellate Division made no such "finding." Rather, the Appellate Division's treatment of the peremptory challenge issue focused on the legitimate reasons which might justify excluding Spanish-speaking jurors, *not* on whether this prosecutor *actually* discriminated. *See State v. Pemberthy*, 224 N.J.Super. at 292, 294, 540 A.2d 227. The assumed factual findings which the State attempts to infer from the Appellate Division's Opinion in no way constitute "factual findings" by an Appellate Court similar to the those at issue in *Sumner*. *See* 449 U.S. at 542, 101 S.Ct. at 766. To the contrary, the Appellate Division's reasoning consists of an analysis of the race neutrality of the State's proffered explanation, a conclusion which the State itself recognizes as a legal conclusion subject to review. *See* State Supp. Brief at 9 ("prosecutor's explanation for his actions presents a legal question for a reviewing court, while the trial court's ultimate ruling on whether the prosecutor intentionally discriminated is one of fact"), citing *Hernandez*, 500 U.S. at –––––––, 111 S.Ct. at 1866–67. Thus, review of the State court's "legal" conclusion is especially important in light of the cursory attention which the Appellate Division paid to the then recently announced *Batson* decision. In any event, the Appellate Division never formally concluded that the prosecutor had not intentionally discriminated against Latinos in jury selection.

In Habeas Corpus proceedings, 28 U.S.C. § 2254 (1991) provides that the findings of the State court will be presumed correct unless it appears:

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal Court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record. . . .

Here, the record is silent on the facts of the Prosecuting Attorney's explanation for his peremptory challenges.

Where it is clear from the record that the prosecutor, in fact, intentionally discriminated against members of the defendant's race, the appropriate remedy is a reversal of the entire judgment and a remand for a new trial. *See Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (finding *Batson* retroactive and remanding to the 10th Circuit for further proceedings), *on remand, U.S. v. Brown*, 817 F.2d 674 (10th Cir.1987) (finding prosecutorial discrimination in the record, reversing the judgment and remanding for a new trial). However, where the record is silent on the prosecutor's justification because *Batson* applies retroactively, and where a possibility of discrimination exists, appellate courts remand the case for an evidentiary hearing. In *U.S. v. Chalan*, 812 F.2d 1302, 1317 (10th Cir. 1987), absent a justification by the prosecutor, the court vacated the judgment of the federal trial court *on the issue of prosecutorial discrimination* and remanded the case to the district court for an evidentiary hearing on the prosecutor's justification. *See also, Batson*, 476 U.S. at 100, 106 S.Ct. at 1725 (remand to state trial court where Supreme Court held on direct review that trial court applied incorrect constitutional standard).

In federal habeas review of state court convictions based on the retroactive application of *Batson*, federal courts have conducted the required *Batson* hearing themselves. Like the case at hand, the petitioner in *Harrison v. Ryan*, 909 F.2d 84 (3d

Cir.1990), brought a petition for relief under 28 U.S.C. § 2254 on *Batson* grounds. While Harrison's direct appeal in state court was pending, *Batson* was decided. After petitioning the district court for *habeas corpus* relief and making a *prima facie* showing of discrimination, the district court ordered a hearing before a Federal Magistrate to determine the existence of a *Batson* violation. *Id.* at 86. Thus, the Federal court conducted the *Batson* hearing. At the hearing, the prosecutor could not remember his reasons for excluding one juror. Accordingly, the court held that the state failed to meet its burden of giving a reasonably specific, race-neutral justification. *Id.* at 88. The petition for a writ of *habeas corpus* was subsequently granted by the district court and a new trial was ordered. *Id.* The Third Circuit affirmed the grant of the writ. 909 F.2d at 88.

In keeping with the procedure upheld in *Harrison*, this court ordered an evidentiary *Batson* hearing, thereby enabling a court to examine for the first time the credibility and demeanor of the Prosecuting Attorney in defending his actions. May 14, 1992 Order, State Supp. Brief App. at 1. The Attorney General had argued to this court that the prosecutor need not offer an explanation because petitioner has failed to establish a *prima facie* case of his discriminatory use of peremptory challenges. However, the court's May 14, 1992, Order indicates the court's conclusion that petitioner has established a *prima facie* case, which conclusion is explained *infra* part I (analysis supporting court's conclusion of *prima facie* case).

### The *Batson* Hearing

The court conducted the necessary *Batson* Hearing on June 22, 1992.[10] Assistant Prosecutor Simon freely admitted that he had a "system" for the use of his peremptory challenges. 6/22/92 Trans. at 13. Specifically, the prosecutor admitted that he intended to strike every Spanish-speaking person from the jury.

**10.** Counsel for Pemberthy, Mr. Pemberthy, Mr. Moncada, and the Deputy Attorney General rep-

Q Did you exercise your peremptory challenges with the intent of striking jurors who spoke Spanish?
A Who spoke Spanish, yes.
Q Why?
A Because I felt that the interpretation of the language would be a very integral part of the case. I didn't want one or two people on the jury who might know Spanish who might disagree with the interpretation as counsel would put forth to have sort of like a more important place on a jury.

I wanted everybody on the same footing, to be able to judge the case on the same footing. Didn't want one juror to have a leg up on the other jurors because of special knowledge.

*Id.* at 30. The prosecutor also admitted that this concern would not justify excluding the entire class of Spanish speaking persons for cause. *Id.* at 45.

The prosecutor further admitted that at the time of petitioner's trial, he was aware of the "notion" that Latino jurors were potentially more sympathetic to Latino defendants. *Id.* at 36–37, 50. The prosecutor noted, however, that he "didn't think there would be a sympathy factor based upon ethnic background" because "most of my witnesses were also Spanish." *Id.*

When asked about the five Spanish-speaking jurors whom he struck, the prosecutor elaborated his reasons for striking jurors Casanova, Quinones, and Bodet. The prosecutor indicates that he struck Ms. Quinones because her daughter and nephew had been arrested for serious crimes. *Id.* at 25. This is an alternative ground for striking her that is supported by the record.

As for Mr. Bodet, the prosecutor testified that he struck Mr. Bodet because "he indicated at the outset that he may have known the defendant. He was taking a look at him, he looked familiar to the juror, and he also indicated he spoke some Spanish." *Id.* at 25. This explanation is not supported by the record. Rather, the transcript of the voir dire Hearing indicates

resenting the Respondent in this petition were present at the hearing.

that Mr. Bodet spoke Spanish and that he lived in a neighborhood shared by Colombians. He specifically testified that he did *not* know the defendants or anyone involved in the case. 31T:164–1 to 31T:166–1. Both the Appellate Division and the State explicitly accepted this unambiguous testimony in the voir dire transcript. *See State v. Pemberthy, supra,* 224 N.J.Super. at 291, 540 A.2d 227; State Reply Brief at 10, n. 9. (However, after the prosecutor's testimony at the *Batson* Hearing, the State now adopts the prosecutor's new explanation that Bodet recognized the defendant. State Supp. Brief at 11.) Given the blatant inconsistencies between the record and the prosecutor's recent testimony, the court has serious doubts about the credibility of the prosecutor's proffered "supplemental" reason for striking Mr. Bodet.

Moreover, the prosecutor's "supplemental" reason for questioning Mr. Casanova's desirability as a juror directly relates to the juror's Spanish-speaking ability. Mr. Simon indicated that Mr. Casanova's assertion that he spoke "perfect" Spanish and the definiteness of his answers prompted his impression that Mr. Casanova could not "put aside his knowledge of Spanish" and accept the agents' interpretation of the tapes. *Id.* at 22, 40–41. As is evident from the transcript of Mr. Casanova's answers, *supra* page 4, Mr. Casanova was "definite" in his promise that he *would accept* the translation as given. As the prosecutor testified at the *Batson* hearing:

Q From your viewpoint, voir dire on the question was a completely useless exercise?

A No, it wasn't.

Q What could Casanova have said otherwise to convince you that he was telling the truth?

A Well, I don't know.

I just—it just was very difficult for me to believe that somebody who said they spoke Spanish all of their life and spoke it perfectly would be able to put aside something he felt was wrong in an interpretation given to him by another.

*Id.* at 41.

The prosecutor further relied on these assumptions in his strikes of jurors Quesada and Rocca. Indeed, the prosecutor did not even attempt to otherwise justify his striking of these jurors.

Q The Court never inquired of Mr. Quesada whether he could put aside his own knowledge and accept the interpretation by the court interpreter?

A Correct.

Q You didn't ask the Court to put that question to the juror, did you?

A No, I didn't.

Q If this question was foremost in your mind, why didn't you pose the question, "Could you put your knowledge of Spanish aside in listening to the translations given by the court interpreter"?

A I probably should have, but I felt Mr. Quesada, if he answered the question honestly, felt he could put it aside. But because of his experience with the language, I didn't think it was possible.

Q So the fact is no matter what answer Mr. Quesada would have given, it would have not been acceptable to you, correct?

A The only two answers were yes and no. No obviously would disqualify him, and yes, I would take it under consideration, but obviously—

Q But you never saw fit to have the judge ask the question of the jury even though it was a concern to you?

A The question was whether they spoke Spanish. The judge asked the question to the jury, and I believe—I don't know if he asked them in general in their presence at one time, but he did not specifically ask that question to this witness.

*Id.* at 42–43; *id.* at 23. The court itself clarified the prosecutor's position in this regard.

THE COURT: And based upon [the transcript] and your testimony, is it correct for the Court to conclude that even if a Spanish-speaking person assured you and the Court that they would accept the official translation, that you had determined in your own mind that notwithstanding that assurance, that that person should be stricken and your preemptories [sic] exercised?

THE WITNESS: I wouldn't say that absolutely, but that was basically what my feelings were.

*Id.* at 52. Thus, the prosecutor's testimony regarding these other jurors suggests that his concerns about Mr. Casanova were not, in fact, based on additional, particularized impressions of this individual. Rather, they were based on the prosecutor's general assumptions about the capacity and credibility of Spanish-speaking persons.[11]

### Factual Findings

After the Hearing, the court allowed the parties until July 15, 1992, to file supplemental briefs and proposed findings of fact. Based on the transcript of the voir dire proceeding, the testimony at the June 22, 1992 Hearing, and the record as a whole, the court makes the following factual findings:

(1) The prosecutor who conducted the jury selection in petitioner's trial admits that he followed a "system" or policy governing his use of peremptory challenges.

(2) That system was the exclusion of all Spanish-speaking persons from the jury.

(3) The prosecutor admits that he used this system because he generally believed that no person who spoke Spanish could put aside that knowledge and abide by the proffered interpretation.

(4) The prosecutor admits that it made no difference to him if a juror credibly asserted that he or she would follow the translation (had the jurors even been given the opportunity to make such an assertion).

(5) The prosecutor admits that he had no other basis for his striking jurors Quesada and Rocca.

(6) The prosecutor's proffer that he struck juror Bodet because he might have known the defendant is unsupported by the record and is not credible; rather, it appears that the prosecutor struck Mr. Bodet based on his Spanish-speaking ability and on the fact that Mr. Bodet lived in a neighborhood shared by Colombians.

(7) The prosecutor's reservations regarding Mr. Casanova were based exclusively on Mr. Casanova's language ability, not his demeanor or any other factor.

(8) There was no official translation of the tapes for purposes of petitioner's trial.

(9) The proper interpretation of the taped Spanish conversations was an issue of fact in the case which the judge instructed the jury to decide for themselves.

(10) The prosecutor admits being aware of the trial myth that Latino jurors are potentially more sympathetic to Latino defendants.

---

11. Under cross-examination, the prosecutor testified as follows:

Q You didn't ask the Court to put the questions to Mr. Quesada and Ms. Quinones because you didn't care what the answer was?
A I probably didn't care if he put the question, because it was asked of the jury panel together, and they were not taken all in a row.

. . . . .

Q The purpose of voir dire was to inquire into individual prejudices of each potential juror, is that correct?
A Correct.
Q The reason you have voir dire is so you can get a response of each particular juror whether they can put prejudices and biases aside?
A Correct.
Q And you had the opportunity to do that?
A Yes.
Q If this issue was so important, you could have had the judge ask those two jurors those questions?

A Correct.
Q If you believe a person's knowledge of Spanish would automatically create some kind of prejudice on the part of that juror, why didn't you say to the Court at some time, "Judge, I don't believe any Spanish-speaking person can sit on the case, and I want every Spanish-speaking person to be set aside or excluded for cause"?
A Well, I didn't think that was proper to do. There could have been circumstances that a person who spoke Spanish, I don't imagine what they could be, could have sat. Don't think they could have been excluded for cause.
Q What more compelling answer can you have as to his answer to the Court, who said, "Certainly, your Honor"? You can't have a more extreme example than that, can you?
A It was his particular attitude....
6/22/92 Trans. at 44–45.

(11) As a result of the prosecutor's "system" for the exercise of his peremptory challenges, the prosecutor struck at least four (4) Latinos from the jury, resulting in a jury without any Latinos.

## DISCUSSION

 Petitioner argues that his Sixth and Fourteenth Amendment rights to an impartial jury and equal protection and due process of law have been violated by the prosecutor's use of peremptory challenges. Pet. Brief at 5. The Supreme Court has determined that the Sixth Amendment does not prohibit the discriminatory exercise of peremptory challenges in the petit jury venire. *Holland v. Illinois*, 493 U.S. 474, 480, 110 S.Ct. 803, 807, 107 L.Ed.2d 905 (1990) (distinguishing the guarantee of an "impartial" jury from a guarantee of a racially "representative" one). The Fourteenth Amendment does, however, prohibit racial discrimination in jury selection. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Hernandez v. New York*, 500 U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). *See also Edmonson v. Leesville Concrete Co.*, 500 U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (applying *Batson* prohibition to litigants in civil trials); *Powers v. Ohio*, —— U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (allowing criminal defendants to raise *Batson* challenges where defendant and challenged jurors are of different races); *Georgia v. McCollum*, —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (applying *Batson* prohibition to criminal defendants).

 As originally announced in *Batson v. Kentucky*, courts must engage in a three-step analysis of the exercise of state peremptory challenges in order to determine whether there is a violation of the Equal Protection Clause. The defendant must first make a *prima facie* showing that the prosecution has exercised its peremptory challenges on the basis of race. The burden then shifts to the prosecutor, who must give a reasonably specific, race-neutral explanation for striking the jurors in question. Finally, the court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. *Batson v. Kentucky*, 476 U.S. at 97–98, 106 S.Ct. at 1723.

### I. The *Prima Facie* Case

 Based upon the submissions presented to the court prior to the *Batson* Hearing, the court hereby explains its previously expressed conclusion that the petitioner has established a *prima facie* showing of discrimination. A defendant must show that he is a member of a cognizable racial group, and that the State used its peremptory challenges to strike other members of defendant's group from the venire. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722.[12] A defendant "may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94, 106 S.Ct. at 1721.

 Petitioner is of Colombian descent and, consequently, a member of the Latino community. The Latino community is a "cognizable racial group" for purposes of examining the State's peremptory challenges under *Batson*. *See generally, Hernandez v. New York*, 500 U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (applying *Batson* to Latinos); *U.S. v. Alcantar*, 832 F.2d 1175, 1180 (9th Cir.1987) (applying *Batson* to Latino–Americans); *U.S. v. Alvarado*, 891 F.2d 439, 443 (2d Cir.1989) (Hispanics are cognizable racial group for purposes of *Batson*).[13] The prosecutor in

---

**12.** *But see Powers v. Ohio, supra* (decided 1991) (allowing criminal defendants to raise *Batson* challenge where defendant and challenged jurors of different races).

**13.** It should be noted that ethnicity, like race, reflects a variety of countries of origin which can comprise a community, but, unlike race, includes such cultural indicators as language and lifestyle. This court will follow the *Batson*

and Equal Protection jurisprudence, which uses the terms "race" and "ethnicity" interchangeably. *See generally, Hernandez*, 500 U.S. at ——, 111 S.Ct. at 1864 (*Batson* applies to group-based exclusions by reason of ethnicity); *id.* 500 U.S. at —— ——, 111 S.Ct. at 1866–67; *U.S. v. Di Pasquale*, 864 F.2d 271, 276 n. 9 (3d Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989).

petitioner's case exercised four of fifteen peremptory strikes against Latinos, plus an additional strike against a Spanish teacher whose ethnicity is unknown, thereby successfully excluding all Latinos from the jury. In addition, the prosecutor's admitted focus on Spanish proficiency raises a strong inference of possible discrimination given the recognized association between language and ethnicity. *See infra* part II. On this basis, the court concludes that petitioner satisfies the *Batson* requirements for a *prima facie* case. *See U.S. v. Esparsen*, 930 F.2d 1461, 1466 (10th Cir.1991) (prima facie case if even one strike results in exclusion of all members of defendant's racial group).

The State contends that petitioner has not established a *prima facie* case because he has not shown systematic exclusion by the prosecutor of Latinos. State Supp. Brief at 10–11. This contention is disingenuous in light of the prosecutor's admission that he "systematically" struck all Spanish speakers (6/22/92 Trans. at 13), coupled with this court's legal conclusion that such an explanation is explicitly race-based. *See infra* pages 28–45. But apart from this fatal concession, the State's argument against systematic exclusion confuses the standards for establishing a *prima facie* case with the subsequent inquiry into race-neutral explanations and pretext. *See* State Supp. Brief at 11–13. While it is true that the prosecutor may have race-neutral explanations for the exclusion of certain Latino jurors, this does not negate the fact that the prosecutor exercised four strikes against Latinos, thereby eliminating all Latinos from this Latino defendant's jury based on a criteria which defines Latino ethnicity. Taking this "totality of circumstances," petitioner has established a *prima facie* case, after which the inquiry proceeds to race-neutral explanations and pretext considerations. *See also U.S. v. Alvarado*, 891 F.2d 439, 441–43 (2d Cir.1989) (discussing stages of *prima facie* analysis).

## II. The Race–Neutral Justification

As recounted *supra*, the state's proffered race-neutral explanation for striking at least four Latinos from the jury is that no Spanish-speaking juror could ever satisfactorily assure the prosecutor that they would accept the state's proffered translation of the evidence. *See also* State Supp. Brief at 4–5 ("Prosecutor Simon indicated that because of Quesada's 'experience' with the language he did not think it was possible for this individual to accept translation by an interpreter") (citation omitted); *id.* at 13 ("where the translation of evidence originally in Spanish is going to be an issue at trial, a prosecutor may, without regard to the particular responses of the jurors about their ability to accept interpretation, strike individuals who speak the language.")

A race-neutral explanation, by definition, requires a justification based on something other than the race or ethnicity of the juror. *Batson v. Kentucky*, 476 U.S. at 97, 106 S.Ct. at 1723; *Hernandez*, 500 U.S. at ——, 111 S.Ct. at 1866.

At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason proffered will be race neutral.

In its Supplemental Brief, the State insists that Latino status is an issue of ethnicity, not race, and thus, the Equal Protection Clause does not apply to Latinos. State Supp. Brief at 10 ("respondents maintain that the term 'Hispanic' does not denote a cognizable class for equal protection purposes"). The court is baffled as to how the State can make such an assertion when the State itself cites *Hernandez* and provides a copy of *Alen v. State of Florida*, 596 So.2d 1083 (D.Ct.App.1992) (Hispanics are cognizable group for Equal Protection purposes) (Respondent Supplemental Appendix at 2). The court flatly rejects the State's contention. *See also Castaneda v. Partida*, 430 U.S. 482, 486 n. 5 and 495, 97 S.Ct. 1272, 1276 n. 5 and 1280, 51 L.Ed.2d 498 (1977) (Hispanics/Mexican–Americans are cognizable racial group under Equal Protection analysis); *U.S. v. Alvarado*, 891 F.2d 439, 433–44 (2d Cir.1989) (no question that Latinos are a cognizable group for equal protection purposes); *U.S. v. Di Pasquale, supra*, 864 F.2d at 276 n. 9 (noting, but not deciding, the widespread conclusion that Latinos are a protected class under *Batson*); *Gov't of the Virgin Islands v. Forte*, 865 F.2d 59, 64 (3d Cir.1989) (holding what *Di Pasquale* assumed *arguendo*, i.e., that *Batson* prohibits the exclusion of other cognizable groups in addition to African–Americans, including "Whites").

*Hernandez,* 500 U.S. at —, 111 S.Ct. at 1866.

 Race and ethnicity, however, cannot be objectively characterized by definitive qualifications; the indicators of race are neither clearly defined nor irrefutable. For example, neither the last name of a juror, nor her skin color conclusively indicates race. *See U.S. v. Esparsen, supra,* 930 F.2d at 1467 (neither names nor appearances conclusively indicate Latino ethnicity).[14] Both indications may be present or absent in a member of a racial group. Yet while such indicators can be misleading, each is a likely manifestation of race.

In interpreting another measure designed to curb racial discrimination, the Third Circuit has concluded that "race" is a term which must be applied broadly. In *Al–Khazraji v. St. Francis College,* 784 F.2d 505 (3d Cir.1986), the court applied Title VII, 42 U.S.C. § 1981, to an ethnic Arab even though, taxonomically, Arabs are Caucasians. Noting that there is no precise definition for the term "race,"[15] the court stressed that the very characteristics which irrationally prejudice others actually become the definition of that race. "[P]rejudice is as irrational as is the selection of groups against whom it is directed. It is thus a matter of practice or attitude in the community, it is a usage or image based on all the mistaken concepts of 'race.'" *Al–Khazraji,* 784 F.2d at 517, quoting *Manzanares v. Safeway Stores, Inc.,* 593 F.2d 968 (10th Cir.1979).

Emerging case law suggests that distinctions based on language ability may be an indicator of or proxy for race or ethnicity.[16] *Hernandez v. New York,* 500 U.S. —, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), involved a Latino petitioner who challenged the State's use of peremptory challenges to bar two Latino prospective jurors from the jury chosen to hear his case. There, as here, the prosecutor offered Spanish-speaking ability as the justification for the strikes. *Id.* 500 U.S. at —, 111 S.Ct. at 1862. However, the *Hernandez* prosecutor further justified the strikes based on the venirepersons' *equivocal responses* to questioning about their ability to accept the official translation. *Id.* 500 U.S. at —, 111 S.Ct. at 1867. The prosecutor explained to the court: "They each looked away from me and said with some hesitancy that they would try, not that they could, but that they would try to follow the interpreter, and I feel that in a case where the interpreter will be for the main witnesses, they would have an undue impact upon the jury." *Hernandez,* 500 U.S. at —, 111 S.Ct. at 1865, citing App. 2–3.

 Because the prosecutor in *Hernandez* cited his specific, individualized reasons for doubting the jurors' ability to defer to the court's translation, the Court did not reach the issue of whether strikes based on Spanish ability alone are race-based. Thus, *Hernandez* is plainly distinguished from the case before this court. In the present case (except for Ms. Quinones), the State relies solely upon the Spanish-speaking ability of the excused jurors. As the *Hernandez* Court explicitly states:

> In holding that a race-neutral reason for a peremptory challenge means a reason other than race, we do not resolve the more difficult question of the breadth with which the concept of race should be defined for equal protection purposes. *We would face a quite different case if the prosecutor had justified his peremptory challenges with the explanation that he did not want Spanish-speaking jurors. It may well be, for certain ethnic groups and in some com-*

---

**14.** The trial judge in petitioner's case suggested the ambiguity of reliance on the name of a juror in his unusual statement: "I don't know, Mrs. Kelly might be a Mrs. Burrito, I don't know." 31T:10–5 to 31T:10–7.

**15.** The Third Circuit cites, *inter alia, Webster's* fifth definition: "[A]ny group of people having the same activities, habits, ideas, etc." *Al–Khazraji,* 784 F.2d at 517, n. 13, *citing* WEB-

STER'S NEW WORLD DICTIONARY 1169 (1972 Ed.).

**16.** *See also, e.g.,* Mari Matsuda, *Voices of America: Accent, Antidiscrimination Law and a Jurisprudence for the Last Reconstruction,* 100 Yale L.J. 1329 (1991) (extending language-discrimination analysis to accents as well).

*munities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis.*

*Hernandez,* 500 U.S. at ——, 111 S.Ct. at 1872 (emphasis added). Thus, *Hernandez* presents, but does not resolve, the question of whether strikes based on language ability alone are race-neutral.[17] It is that precise situation which is before this court.

The *Hernandez* Court strongly intimates that language ability may be a surrogate for race, and other courts have ventured further toward that conclusion. In *Gutierrez v. Mun. Ct. of S.E. Judicial Dist.,* 838 F.2d 1031 (9th Cir.1988), *vacated as moot on other grounds,* 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989), the Ninth Circuit upheld a preliminary injunction issued against the Los Angeles municipal courts' enforcement of an "English only" rule.[18] Citing several commentators,[19] the court went on to note that "such [language-based] rules can readily mask an intent to discriminate on the basis of national origin." *Id.* at 1040.

In addition, in *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the Supreme Court held that Hispanics/Mexican–Americans were a cognizable racial group for purposes of Equal Protection analysis under *Swain v. Alabama.* Significantly, the Court defined "Hispanics" based upon their surname *or* Spanish-speaking ability.

For our purposes, the terms "Spanish-surnamed" and "Mexican–American" are used as synonyms for the census designation "Persons of Spanish Language or Spanish Surname." Persons of Spanish language include both those whose mother tongue is Spanish and all other persons in families in which the head of the household or spouse reported Spanish as the mother tongue.

*Castaneda,* 430 U.S. at 486 n. 5, 97 S.Ct. at 1276 n. 5. Thus, long before *Hernandez,* the Supreme Court (and the census bureau) recognized the absolute centrality of Spanish speaking ability to a person's identification as a Hispanic or Latino. Indeed, *Batson* cites *Castaneda* with approval, 476 U.S. at 96, 106 S.Ct. at 1723, as does the Third Circuit. *Di Pasquale,* 864 F.2d at 276–77. *See also* Perez–Rivas, *supra* note 2 ("'Latino' is an abbreviated version of the Spanish word latinoamericano, or Latin American. 'Hispanic' is the English translation of hispano, a word commonly used to describe all peoples of Spanish-speaking origin.")[20]

As *Castaneda* indicates, other branches of the federal government have explicitly connected language rules to racial and/or ethnic discrimination. The Equal Employment Opportunity Commission defines national origin discrimination as "including,

**17.** *See also U.S. v. Alcantar,* 897 F.2d 436, 438–40 (9th Cir.1990) (presenting, but not deciding, same question of whether strikes based on Spanish speaking ability are race-based).

**18.** While the case is vacated and, therefore, cannot be relied upon for its precedential value, this court agrees with the court's analysis of language as a surrogate of race.

**19.** The commentators agreed that language is an integral aspect of national origin. *See generally,* Piatt, *Toward Domestic Recognition of a Human Right to Language,* 23 Hous.L.Rev. 885, 898–900 (1986); Karst, *Paths to Belonging: The Constitution and Cultural Identity,* 64 N.C.L.Rev. 303, 361–69, 376–77 (1986); Comment, *Language Discrimination Under Title VII: The Silent Right of National Origin Discrimination,* 15 J. Marshall L.Rev. 667, 676 (1982); Note, *"Official English": Federal Limits on Efforts to Curtail Bilingual Services in the States,* 100 Harv.L.Rev. 1345,

1354 (1987); Comment, *Native–Born Acadians and the Equality Ideal,* 46 La.L.Rev. 1151, 1165–67 (1986).

**20.** The State argues that, because the language criterion also excluded a juror whose language ability was not necessarily linked to her race or ethnicity (*i.e.,* a Spanish teacher of unknown ethnicity), the exclusion of Spanish–speaking persons is necessarily race-neutral. Resp. Brief at 12. However, the applicability of the classification in this case to jurors outside the racial group does not necessarily imply that the explanation is not race-based.

This is not to say that the State's point is not relevant; it is relevant to any consideration of pretext. For instance, it may demonstrate the prosecutor's good faith, racially neutral application of his stated reason, but it does not neutralize or alter the fact that the prosecutor has proffered a race-based reason for the strikes. *See infra* part III.

but not limited to, the denial of equal employment opportunity because of an individual's place of origin; or because an individual has the physical, cultural *or linguistic characteristics* of a national origin group." 29 C.F.R. § 1606.1 (1990) (emphasis added). The anti-discrimination regulation goes on to reason that "[t]he primary language of an individual is often an essential national origin characteristic." 29 C.F.R. § 1606.7.

In keeping with *Hernandez, Castaneda,* and the Third Circuit's recommendation for broad racial designations, the court concludes that under the circumstances of this case, Spanish-speaking ability bears such a close relationship to a juror's identity as a Latino that it is a surrogate for race and/or ethnicity. As mentioned *supra,* the *Al–Khazraji* Court was squarely presented with the questions of what is race and how is it identified. 784 F.2d 505, 514–18 (in 42 U.S.C. § 1982 context). The Third Circuit concluded that invidious racial categories were not subject to taxonomically precise definition. Rather, "racial" groups can be defined by a variety of factors such as national origin, ethnicity, appearance, habits, and ideas. Indeed, the court concluded that the identification of a determinative "racial" characteristic is as irrational as the prejudice which may attend to that characteristic.

Language is certainly one characteristic which can be linked to race. Petitioner's trial, like the trial of the petitioner in *Hernandez,*

> took place in a community with a substantial Latino population, and petitioner and other interested parties were members of that ethnic group. It would be common knowledge in the locality that a specific percentage of the Latino population speaks fluent Spanish, and that many consider it their preferred language, the one chosen for personal communication, the one selected for speaking with the most precision and power, *the one used to define the self.*

*Hernandez,* 500 U.S. at ——, 111 S.Ct. at 1868 (emphasis added). In petitioner's case, his status or identification as a Latino is essentially defined by his membership within the Latino community, virtually all of whom could reasonably be expected to retain their first language of Spanish. In this community, last names, national origin, and skin tone all vary, as do various aspects of their cultural heritage. Consequently, these characteristics are not generally conclusive signifiers of a Latino. *See U.S. v. Esparsen, supra,* 930 F.2d at 1467; *U.S. v. Campione,* 942 F.2d 429, 433 (7th Cir.1991) (sur-name alone is insufficient to establish ethnicity). However, the one characteristic that links and, in essence, *defines* this community/"race" and exposes it to irrational discrimination is their status as native Spanish speakers. *See Castaneda v. Partida, supra,* 430 U.S. at 486 n. 5, 97 S.Ct. at 1276 n. 5. Thus, the decision to strike all Spanish-speaking persons—especially native speakers who speak it "perfectly"—is, by definition, a decision to strike all Latino jurors. In this sense, the prosecutor in this case has offered a race-based reason for excluding jurors.

In this case, the court has made the conceded factual finding that the prosecutor gives no reason for striking jurors Quesada and Rocca other than their Spanish-speaking ability. The court has made the further factual finding that the prosecutor struck jurors Casanova and Bodet on the same basis, and that the additional "attitude concerns" cited by the prosecutor are not credible. Given the court's conclusion that in this case, Spanish proficiency is a surrogate for race/ethnicity, the prosecutor has offered an explicitly race-based reason for striking all of the Latino jurors from the venire.[21]

For purposes of clarification, the foregoing analysis is *not* a "disparate impact" analysis. Disparate impact analysis would assign a proffered explanation race-based status based on the effect or result that all

**21.** The prosecutor proffered the same race-based reason for all of the Latino jurors which he struck. However, the court notes that the prosecutor proffered additional, race-neutral reasons for striking Ms. Quinones. *See U.S. v. Casper,* 956 F.2d 416, 419 (3d Cir.1992) (strike based on juror family member's involvement in crime is race-neutral).

jurors of a certain race were excluded. For instance, the disparate impact discussion in *Hernandez* concerned whether the exclusion of all jurors who hesitate in answering questions regarding their ability to follow the interpreter results in a disproportionate exclusion of bilingual Latinos. As the Court reasoned, this is quite different from the race-based scenario in which a prosecutor explicitly excludes bilingual Latinos. *Hernandez*, 500 U.S. at ――――――, 111 S.Ct. at 1867–68. Although the facts in petitioner's case may appear to resemble a disparate impact dynamic, a more precise description of what occurred is that the prosecutor applied a trial-related reason, which reason is the very definition of the racial group. In other words, the basis for the strikes—Spanish-speaking ability—is the defining characteristic of Latinos. Such a reason can only be understood as race-based. Indeed, this is the scenario which *Hernandez* identified as race-based.

The State contends that strikes based on Spanish-speaking ability cannot be race-based in the context of petitioner's trial because jurors' Spanish ability was "trial related."[22] In other words, the State exercised strikes based on language ability, not race or ethnicity. However, given the court's conclusion that in this case, Spanish proficiency is a surrogate for race, if the State were to press its contention that Spanish ability is a legitimate concern given the issues at trial, the State's argument essentially reduces to the contention that there can be a race-based but nonetheless legitimate, trial-related reason for striking jurors. The court rejects this proposition for two reasons: (1) the Equal Protection Clause does not allow any race-based discriminatory reasons, no matter how relevant the prosecutor may believe those reasons to be; and (2) the State's proffered "trial-related reason" is itself race-based and discriminatory.

First, the *Hernandez* Court reaffirms *Batson*'s holding that a prosecutor's use of a race-based reason for striking jurors violates the Equal Protection Clause. *Hernandez*, 500 U.S. at ――――, 111 S.Ct. at 1866 ("In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.") This court knows of no precedent (nor has the State cited one) which would allow this court to ignore or to excuse a blatant violation of the Equal Protection Clause, nor does *Hernandez* or the entire line of *Batson* jurisprudence countenance such an excuse. Otherwise, the second step of the *Batson* inquiry has no significance.

■ As clarified in *Hernandez*, the proffer of a race-based reason is itself an admission by the prosecutor of a racially discriminatory intent or purpose.

Equal Protection analysis turns on the intended consequences of government classifications. Unless the government actor adopted a criterion with the intent of causing the impact asserted, that impact itself does not violate the principle of race-neutrality. [In *Hernandez*, n]othing in the prosecutor's explanation shows that he chose to exclude jurors who hesitated in answering questions about following the interpreter *because* he wanted to prevent bilingual Latinos from serving on the jury.

*Id.* 500 U.S. at ――――――, 111 S.Ct. at 1867–68 (emphasis in original). In contrast, the prosecutor in Mr. Pemberthy's trial explicitly admits his intention to exclude bilingual Latinos from the jury. The difference in *Hernandez* is that the Court accepted the prosecutor's specific, individualized representations about the hesitancy of the excluded jurors to follow an *official* translation as the proffered race-neutral explanation. *Id.* 500 U.S. at ――――, 111 S.Ct. at 1867.[23] However, it is clear that had the

---

**22.** The court notes that the State quotes selectively from *Hernandez,* editing out phrases in the Opinion which hold that the prosecutor must have an individualized basis for striking Spanish-speaking jurors. *See* State Supp. Brief at 14, quoting *Hernandez,* 500 U.S. at ――――, 111 S.Ct. at 1873.

**23.** Therefore, the Court specifically did not reach the issue of whether language ability alone was a race-neutral explanation under the

Court determined that the prosecutor had offered a race-based reason, the constitutional violation would have been established and the inquiry would have ended. There simply is no basis for allowing a race-based peremptory strike of a juror, no matter how relevant to the trial a prosecutor may believe that race-based reason to be. *See Georgia v. McCollum,* —— U.S. at ——, 112 S.Ct. at 2351 (rejecting defendants' argument that "circumstances of their case gave them the right to exclude African–American citizens from participating as jurors in the trial").[24]

▇ The court's second basis for rejecting the State's argument that the prosecutor's trial related reason is race-neutral is that the prosecutor's proffered "trial-related reason" is itself race-based and discriminatory. According to *Hernandez,* peremptory challenges must not rest "on the intention to exclude Latino or bilingual jurors, nor on stereotypical assumptions about Latinos or bilinguals". 500 U.S. at ——, 111 S.Ct. at 1867. The prosecutor in petitioner's case admits that he did not ask the trial judge to make specific, individual inquiries of the jurors regarding their willingness and/or capacity to follow the translation as it is given because the prosecutor did not believe that any Spanish-speaking person could disregard their own interpretation of the Spanish conversations. Thus, the prosecutor made generalized, group-based assumptions about the capacity, behavior, and trustworthiness of Spanish speakers, without any individualized basis for concern. These assumptions are race based, discriminatory, and without foundation. "We may not accept as a defense to racial discrimination the very stereotype the law condemns." *Powers v. Ohio, supra,* —— U.S. ——, 111 S.Ct. at 1370.

Moreover, further analysis of the prosecutor's "trial related" reason—the concern that Spanish speaking jurors will utilize their own understanding of the language—illustrates how strikes of Spanish speakers is explicitly race-based and discriminatory. It is necessary to analogize what occurs when recordings of English conversations are presented before English-speaking jurors. When transcripts are prepared and furnished to the jury, the jury is invariably instructed that the conversations—the tapes themselves—are the evidence, and that the transcripts are merely to assist the jury. The jury is instructed that if they hear anything on the tapes that is different from what appears on the transcripts, it is what they hear that is the evidence, and not what is contained in the transcript. Therefore, in the first instance, the jurors are permitted to ignore the transcript and to make a fact-finding contrary to the transcript. Secondly, if English is involved and there is a dispute as to the meaning of certain words utilized by the persons speaking, the jury is free to utilize their own common experience and understanding of the meaning of the words in evaluating the conversation. Therefore, whenever English is utilized, the jurors are free to make a determination as to what is spoken and then to interpret and to give meaning to the words spoken.

---

circumstances of that case. However, the Court clearly expressed grave reservations regarding this "hypothetical" circumstance. *Id.* 500 U.S. at —— – ——, 111 S.Ct. at 1872–73.

**24.** *Batson* jurisprudence builds upon earlier case law which holds that racial discrimination in jury selection is absolutely prohibited. *See Batson,* 476 U.S. at 85–87, 106 S.Ct. at 1716–18; *id.* at 87, 106 S.Ct. at 1718 ("A person's race simply 'is unrelated to his fitness as a juror'[;] denying a person participation in jury service on account of his race ... unconstitutionally discriminate[s] against the excluded juror") (citations omitted). *Batson* pursues the reasoning announced in *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880), a case decided long before equal protection jurisprudence de-veloped notions of "strict scrutiny." Thus, there is no room in *Batson* jurisprudence for the argument (were the State to make it) that striking Spanish–speaking jurors is a "necessary" means to effectuate a "compelling" state interest.

"[I]f race stereotypes are the price for acceptance of a jury panel as fair," we reaffirm today that such a "price is too high to meet the standard of the Constitution." *Edmonson,* 500 U.S., at —— – ——, 111 S.Ct., at 2088. ... It is an affront to justice to argue that a fair trial includes the right to discriminate against a group of citizens based upon their race. *Georgia v. McCollum,* —— U.S. at ——, 112 S.Ct. at 2358.

In petitioner's case, the wiretaps are in Spanish. There is no reason why the same rule should not apply. Jurors were invited to determine as a factual matter what words are spoken and the meaning for those words. Absent a stipulation or a court determination that there is an official transcript, the jury was free to make its own determination as to what words were spoken and what they meant. State Supp. Brief at 13–14, n. 12 (jurors received general instruction on witness credibility). The prosecution prepared the so-called "official" translation in this matter, and the defendants made it clear from the outset that they would contest the translation and contend that certain words were entitled to another meaning. Although defendants failed to provide an expert on the subject, they were not precluded from challenging the interpretations during the course of the trial. Therefore, there is a very good argument that the prosecutor's proffered reason for the strikes—fear of Spanish speakers reinterpreting the translation—does not meet the standard of a good faith, non-discriminatory reason, since it denies Spanish speaking jurors, exclusively because of their status as Spanish speakers, the same opportunity that the prosecutor necessarily afforded to English speaking jurors.[25]

The court recognizes that language ability may be relevant in trials such as petitioner's which involve complex, disputed translations. But the relevance must be clear. This court cannot imagine an instance where the fact of language proficiency is, *in and of itself,* a factor relevant to the trial.[26] However, there may be issues *surrounding* or flowing from language ability which are relevant, such as a juror's individual willingness to accept official translations. The mere fact of language proficiency, without more, bears no obvious relevance to those secondary concerns. "Mere knowledge of [a foreign] language cannot reasonably be regarded as harmful." *Hernandez,* 500 U.S. at ——, 111 S.Ct. at 1877 (quoting *Meyer v. Nebraska,* 262 U.S. 390, 400, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923)).

As stated *supra,* under the *Batson* three-step inquiry, the proffer of a race-based reason ordinarily ends the Equal Protection analysis and compels the conclusion of a constitutional violation, and this court concludes that the prosecutor has offered a race-based reason. However, the court will go on to consider the third step of the inquiry—proof of purposeful discrimination—in the event of an appeal which determines that the prosecutor's proffered reason was race-neutral, rather than race-based as this court has concluded.

### III. Proof of Purposeful Discrimination

■ The third step of the *Batson* inquiry requires an examination of whether the petitioner has carried his burden of proving purposeful discrimination. *Batson,* 476 U.S. at 98, 106 S.Ct. at 1723. In the ordinary case, this necessitates a finding that

---

**25.** *See Hernandez,* 500 U.S. at ——, 111 S.Ct. at 1872 ("Our decision today does not imply that exclusion of bilinguals from jury service is wise, or even that it is constitutional in all cases. It is a harsh paradox that one may become proficient enough in English to participate in a trial, only to encounter disqualification because he knows a second language as well.") (citation omitted).

In this case, even if the prosecutor has a legitimate concern that (1) Spanish–speakers will be especially skeptical of the State's proffered translation, and (2) Spanish-speakers possess an "expertise" which will influence the other jurors, the inextricable linkage between Spanish–speaking ability and Latino ethnicity necessitates the conclusion that the State must tolerate this risk.

**26.** The court does not hold that, as a matter of law, all language ability distinctions (or Spanish

in particular) *always* constitute race-based distinctions. It is certainly possible that various languages and circumstances would not demand the conclusion that language proficiency is a surrogate for race or ethnicity (e.g., Latin, Phoenician, etc.). In such instances, under current law, counsel are entitled to use their peremptory strikes based on language or any other irrational assumption or prejudice.

[But t]his was not a case where by some rare coincidence a juror happened to speak the same language as a key witness, in a community where few others spoke that tongue. If it were, the explanation that the juror could have undue influence on jury deliberations might be accepted without concern that a racial generalization had come into play. *Hernandez,* 500 U.S. at ——, 111 S.Ct. at 1868.

the State's proffered race-neutral explanation is a pretext for discrimination and that the petitioner has proven the prosecutor's intent to discriminate. Even if this court were to consider Spanish-speaking ability a race-neutral explanation in this case, the court finds that the prosecutor in petitioner's trial purposefully discriminated in the use of his peremptory strikes.[27] The court bases this finding on the following factors: (1) the prosecutor's stated intention to exclude all Spanish speakers strikes dangerously close to the defining racial and/or ethnic characteristic of Latinos; (2) no individual response or behavior could dissuade the prosecutor from his decision to strike all Spanish speakers; (3) the prosecutor gave no consideration to any alternative or more accurate means to satisfy his concerns with potential jurors; (4) the prosecutor's reason to suspect the abilities and anticipated behavior of Spanish speakers is premised on unfounded discriminatory and prejudiced assumptions about bilingual Spanish speakers, especially native speakers; (5) the prosecutor's attempt to provide an individualized, race-neutral explanation for striking jurors Casanova and Bodet is not credible; (6) the prosecutor's admission that he was aware of the Latino "sympathy factor," coupled with all the other aforementioned prejudices, suggests that the prosecutor struck Latino jurors based in part on their shared race with the defendants; and (7) the clearly foreseeable effect of the prosecutor's system for striking jurors suggests that the prosecutor purposefully intended to exclude Latinos from the jury. The court has previously considered many of these factors in its foregoing discussion of the prosecutor's proffered race-based reason for the strikes. However, the court will briefly relate how these factors also expose the prosecutor's proffered explanation as a pretext for racial discrimination under the alternative scenario in which the prosecutor's proffered reason is considered to be race neutral.

As recounted *supra*, the prosecutor admits his intention to strike all Spanish speakers from the jury. The *Hernandez* Opinion concludes with the following proviso:

[A]s we make clear, a policy of striking all who speak a given language, without regard to the particular circumstances of the trial or the individual responses of the jurors, may be found by the trial judge to be a pretext for racial discrimination.

*Id.* 500 U.S. at ——, 111 S.Ct. at 1873. The State contends that the prosecutor's policy cannot be a pretext for discrimination because Spanish speaking ability was relevant to the particular circumstances of the trial. However, as explained *supra* page 44–45, language ability alone has no significance in and of itself. Language proficiency may be relevant to the extent that other factors come in to play, such as a juror's refusal to follow or to consider an interpreter's translation. Although this was the prosecutor's "trial-related" concern, he instead chose to strike all Spanish speakers, irrespective of their capacity or willingness to follow the interpreter. This incongruence between the supposed target group of unreliable jurors and the actual target group of Spanish speakers strongly suggests that the prosecutor's stated reason was in fact a pretext for discrimination against members of the Latino community, who are defined and identified by their bilingual ability.

This suggestion of pretext is further confirmed by the fact that in most instances, no inquiry was even made as to whether

---

**27.** The State contends that under *Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981), this court must accept the New Jersey Appellate Division's "finding" that the prosecutor did not discriminate against Latinos. State Supp. Brief at 14–15. However, as discussed *supra*, the Appellate Division made no such "finding." Rather, the Appellate Division's treatment of the peremptory challenge issue focused on the legitimate reasons which might justify excluding Spanish–speaking jurors, *not* on whether this prosecutor *actually* discriminated. *See State v. Pemberthy,* 224 N.J.Super. at 292, 294, 540 A.2d 227. The factual findings which the State attempts to infer from the Appellate Division's Opinion in no way constitute "factual findings" by an Appellate Court similar to the those at issue in *Sumner. See* 449 U.S. at 542, 101 S.Ct. at 766. To the contrary, the Appellate Division's reasoning is limited to an analysis of the race neutrality of the State's proffered explanation.

the juror would follow the interpreter's translation, indicating that the answer would have been immaterial to the exercise of peremptories by the prosecutor. Indeed, the prosecutor admits that the individual responses could not dissuade him from his intention to strike every Spanish speaker. This admission further erodes the credibility of the prosecutor's concerns regarding juror acceptance of the translation and juror expertise in the jury room. Nor did the prosecutor consider exploring alternative ways in which to identify those jurors who would not follow either the translation or the court's instructions. For instance, as one court suggested based on an "initial compromise reached with the jurors and the district court during voir dire": "If the prosecution were truly concerned only with differing interpretations of the evidence, ... they could solve this problem in other ways, such as by having a juror who disagreed with a translation notify the court, and agree in advance not to discuss his own interpretation with the other jurors." *U.S. v. Alcantar, supra,* 897 F.2d at 440 and n. 3. Such an alternative precisely addresses the prosecutor's concerns without requiring the blanket exclusion of all Latinos.

Moreover, the prosecutor's explanation for why he suspected the abilities and behavior of Spanish speakers—especially native speakers—is premised on unfounded discriminatory and prejudiced assumptions about bilingual Spanish speakers, i.e., Latinos. The prosecutor states that no native speaker could ever set aside their knowledge of the language and restrict themselves to the evidence as presented. However, the prosecutor admits that he had no particular, individualized reason for doubting Mr. Quesada's assertion that he would follow the court's instructions. Thus, unless the inability to accept and to follow instructions is considered an inherent quality of Spanish-speaking people, the prosecutor's concern is unfounded. Such an assumption of inherent disability necessarily excludes Latinos, by definition, from sitting on juries where a Latino defendant has entered a transaction in their shared language. It demonstrates an "intention to exclude Latino or bilingual jurors [and]

stereotypical assumptions about Latinos or bilinguals" which the *Hernandez* Court criticizes. *Id.* 500 U.S. at ——, 111 S.Ct. at 1867.

Where a juror agrees to accept the interpreter's translation and to follow the court's instructions, the prosecutor's proffered non-discriminatory reason disappears, unless the prosecutor is justified in either rejecting the juror's individual assurance as untruthful or inaccurate. Under these circumstances, the prosecutor must further justify his disregard or disinterest in the juror's response—in this case, that the juror would follow the court's instructions regarding the transcript. Normally, when prospective jurors give assurances that they can be fair and impartial or will follow the court's instructions, counsel are free to reject their answers and to exercise their peremptory challenges nonetheless. But here, the prosecutor admits that his further basis for striking these jurors was his prejudiced assumptions about bilingual Latinos. Thus, there is no question that his proffered reason was in fact a pretext for intentional discrimination against Latinos.

The court's conclusion of pretext is further confirmed by the prosecutor's complete lack of credibility regarding his explanations for striking jurors Casanova and Bodet. The prosecutor attempted to justify striking Mr. Casanova based on his impressions of Mr. Casanova's "definite" attitude. However, upon further inquiry, it became obvious to the court that the prosecutor was not troubled by Mr. Casanova's attitude so much as by the prosecutor's own prejudiced assumptions about bilingual Latinos. Based on this court's observation and inquiry of the prosecutor at the *Batson* hearing, the court concludes that the prosecutor's stated reason for striking Mr. Casanova is not credible, thereby raising further doubt in the court's mind as to the overall credibility of the prosecutor's denial that he was concerned about race and race alone. *See U.S. v. Alcantar, supra,* 897 F.2d at 440 ("Any evidence tending to show that the government's non-language reasons for striking jurors were pretextual would also have been evidence

of bad faith on the part of the prosecutor, which may have infected his language justification[;] Once the prosecutor was shown as possessing bad faith on the former reasons, the judge may have been less likely to view the latter reason as genuine and sincerely held.")

Moreover, the prosecutor's explanation for striking Mr. Bodet points out the prosecutor's actual focus on race. Mr. Bodet testified that he spoke some Spanish and that he lived in a neighborhood shared by Colombians. He specifically testified that he did not know the defendants; indeed, the court established that Mr. Bodet lived in a different part of town. However, at the *Batson* hearing, the prosecutor testified that he struck Mr. Bodet because he indicated that he might have known the defendant. This explanation is flatly contradicted by the record and is not credible. Rather, the prosecutor appears to have drawn a connection between Bodet's Colombian neighbors and the defendants, who were Colombian. This confusion and/or extrapolation reveals the prosecutor's focus on any ethnic links between the defendants and the prospective jurors. In other words, the record exposes the prosecutor's real concern with race and ethnicity, as opposed to personal connections between jurors or an individual concern with a juror's ability to follow the court's instructions regarding the translation.

■ In addition to the prejudice and discriminatory assumptions which underlie the prosecutor's proffered justifications, the court cannot ignore the prosecutor's acknowledgement that he was aware of the trial myth that Latino jurors are more sympathetic to Latino defendants. *Batson* specifically prohibits such a basis for a peremptory strike. 476 U.S. at 89, 106 S.Ct. at 1719. Like the prosecutor in *Hernandez*, the prosecutor here indicated that this was not a factor in his thinking because his witnesses were also Latinos. This denial certainly is one factor to consider on the question of pretext, *Hernandez*, 500 U.S. at ——, 111 S.Ct. at 1872, but given the prosecutor's explicit testimony, so charged with prejudiced, group-based assumptions

(e.g., the prosecutor's lack of credibility with respect to jurors Casanova and Bodet, the prosecutor's prejudiced assumptions about Latinos, etc.), this factor does not soften the court's conclusion that the prosecutor purposefully discriminated against bilingual Latinos.

In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Hernandez*, 500 U.S. at ——, 111 S.Ct. at 1869 (citation omitted). In this case, the court concludes that the prosecutor's denial that he considered the "sympathy factor" in his strike of Latinos is suspect. To the contrary, the court concludes that the "sympathy factor" was one basis for the contested strikes, and the prosecutor's explanation that he struck "Spanish speakers" as opposed to "Latinos" is a pretext for race discrimination.

■ Finally, the court concludes that the prosecutor's race-neutral explanation is not credible but rather is a pretext for race discrimination given the guaranteed effect of excluding all Latinos from the jury. To the extent that Latinos are defined by their bilingual Spanish ability (*see supra* pages 28–45), the clearly foreseeable effect of the prosecutor's policy was the exclusion of all members of petitioner's race from the jury. The *Batson* Court noted that "the trial court must also consider the impact that its decision will have on the opportunity for a minority defendant to be tried by a jury drawn from a cross-section of the community." *Batson* 476 U.S. at 79, 106 S.Ct. at 1712. "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears *more heavily on one race than another.*" *Washington v. Davis*, 426 U.S. 229, 242, 96

S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976) (emphasis supplied). Although disparate impact does not conclusively prove discriminatory purpose, *Hernandez*, 500 U.S. at ——, 111 S.Ct. at 1867, courts may consider the impact on the racial group in question as evidence of a pretext for racial discrimination. *Id.* 500 U.S. at ——, 111 S.Ct. at 1868. Therefore, the fact that blanket, undifferentiated exclusion of Spanish-speaking jurors will exclude virtually every member of the Latino community, in addition to other Spanish speakers, can contribute towards a finding of discriminatory purpose.

 The State's argument that the prosecutor also struck a potentially non-Latino Spanish teacher does not dissuade the court from its conclusion of pretext. Aside from the possibility that Ms. Rocca may well have been Latino, the fact that Ms. Rocca was swept into the prosecutor's category of strikes does not minimize the prosecutor's admission that he did not care what any Spanish-speaking person had to say given his assumptions about bilingual Spanish speakers. For the same reason, the additional, acceptable, non-discriminatory bases for striking Ms. Quinones does not diminish the prosecutor's admission regarding juror Quesada. The Third Circuit has ruled that "the exclusion of one [member of the defendant's racial group] from the jury on the basis of race is sufficient to require a new trial pursuant to *Batson.*" *Harrison v. Ryan*, 909 F.2d 84 (3d Cir. 1990) (holding that a new trial is warranted for a petitioner for *habeas corpus* where the prosecutor could not remember his justification for one Black juror at the *Batson* hearing). Thus, the intentional discriminatory strike of even one juror justifies setting aside the conviction. The strike of juror Quinones, even if justified, does not refute pretext with respect to jurors Casanova, Quesada, Bodet, and (possibly) Rocca. Similarly, the facts surrounding juror Rivera and the two Portuguese jurors do not refute pretext where the court finds purposeful discrimination with respect to other excused jurors. *See generally U.S. v. Alvarado*, 923 F.2d 253, 256 (2d Cir.1991) (leaving some members of racially cogniza-

ble group on jury does not defeat prima facie case).

In this case, given the clearly foreseeable race-differential impact of striking Spanish-speaking jurors, coupled with all of the aforementioned inconsistencies and lack of credibility with respect to the prosecutor's racial distinctions, the court makes the specific factual finding that the prosecutor at petitioner's trial purposefully intended to discriminate against Latinos.

CONCLUSION

As the foregoing citations reflect, the Supreme Court has recently recognized what judges and lawyers have known for decades: Peremptory challenges have been used to discriminate with the acquiescence of the courts. Peremptory challenges traditionally have been based upon stereotypes, bias and prejudice and the insulting assumption that membership in a particular race, religion, nationality, gender or occupation is a reliable predictor of a juror's ultimate verdict.

With the recognition of this prevailing practice, the Supreme Court has attempted to establish a procedure to combat it. Counsel engaged in apparently discriminatory challenges are required to furnish non-discriminatory explanations for their peremptory strikes. As a result, the discriminatory practices are unlikely to diminish; rather, the ingenuity of counsel to explain their actions is likely to expand. Furthermore, the procedure places the trial judge in the awkward position of determining the credibility of the explanations proffered by counsel. It will require the trial court, as the court does here, frequently to make findings which impugn the integrity of honorable and dedicated prosecutors such as Mr. Simon. This decision imputes bad motives to him where none may have existed.

The issue presented here requires the court to determine under what circumstances an apparently relevant and otherwise acceptable reason is merely a surrogate for discrimination or a pretext for it. The complexity and subtlety of such inquiries and the need to explore the credibility of counsel should cause us to reexamine the need to retain peremptory challenges.

Although they clearly serve a useful purpose in permitting the parties an active role in jury selection and a means for discharging unacceptable prospective jurors where it is difficult to articulate a challenge for cause, they also provide a means of skewing random jury selection, insulting those who are discharged without reason or explanation, and a vehicle for promoting discrimination in an institution dedicated to its destruction.

As detailed above, the court finds that the prosecutor at petitioner's trial has offered a race-based reason for striking at least three Latinos from the jury at petitioner's trial. Accordingly, under the applicable law, the court must set aside petitioner's conviction. In addition, even if the prosecutor's explanation were to be considered race-neutral, the court finds that the proffered explanation is in fact a pretext for the prosecutor's race-based peremptory strikes.

For the foregoing reasons, the court will grant petitioner's application for a writ of habeas corpus. Counsel for the petitioner should submit an appropriate order consistent with this Opinion, and the court will enter a compatible order in the case of *Moncada v. Rafferty, et al.*, Civ. No. 89–1276 (HLS). The court will enter these orders, subject to objections by the Respondent, unless within 90 days, the State indicates its intention to re-prosecute the petitioners or files a notice of appeal from this court's orders, in which case these orders will be stayed pending determination of the appeal.